Britt Allen RIPKOWSKI, Appellant,

v.

The STATE of Texas.

No. 73,590.

Court of Criminal Appeals of Texas.

Nov. 7, 2001.

Rehearing Denied Dec. 19, 2001.

David Cunningham, Houston, for appellant.

Carmen Castillo Mitchell, Assist. DA, Houston, Matthew Paul, State's Attorney, Austin, for State.

## OPINION

KELLER, P.J., delivered the opinion of the Court, joined by KEASLER, HERVEY, HOLCOMB, and COCHRAN, JJ.

Appellant was convicted of capital murder,[1] the jury answered the future danger-ousness issue affirmatively,[2] and the trial judge sentenced appellant to death. Direct appeal to this Court is automatic.[3] Appellant raises twenty-four points of error. We will affirm.

### 1. Oral Statements

In points of error one through six, appellant complains about a non-recorded oral statement he made to the police concerning the location of the victim's body. In points seven through twelve, he complains about a videotaped confession. He alleges violations of Articles 38.21, 38.22, 38.23, *Miranda v. Arizona*,[4] the Fifth and Sixth Amendments to the United States Constitution, and counterpart provisions in the Texas Constitution. We consider only the *Miranda* issue because appellant has failed to present argument or authorities in support of the other allegations in these points of error.[5]

■ In reviewing claims of *Miranda* violations, we conduct the bifurcated review articulated in *Guzman v. State*.[6] We afford almost total deference to the trial court's rulings on questions of historical fact and on application of law to fact questions that turn upon credibility and demeanor while we review *de novo* the trial court's rulings on application of law to fact

---

1. "A person commits an offense if he commits murder as defined under Section 19.02(b)(1) and ... the person murders an individual under six years of age." Texas Penal Code § 19.03(a)(8).

2. Article 37.071, § 2(b)(1). Unless otherwise indicated, all future references to Articles refer to the Code of Criminal Procedure.

3. Article 37.071 § 2(h).

4. 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

5. *See Salazar v. State*, 38 S.W.3d 141, 147 (Tex.Crim.App.2001); *Wood v. State*, 18 S.W.3d 642, 649 n. 6 (Tex.Crim.App.2000).

6. *Maestas v. State*, 987 S.W.2d 59, 60 (Tex. Crim.App.), *cert. denied*, 528 U.S. 834, 120 S.Ct. 93, 145 L.Ed.2d 79 (1999).

questions that do not turn upon credibility and demeanor.[7]

### a. *Facts*

Monica Allen and appellant dated for awhile but had a stormy relationship. Allen had a two-year-old daughter, Dominique Frome, from a prior relationship. Appellant had lived with Allen at various times in Salt Lake City, Utah and in Houston, Texas. At the time of the events giving rise to this prosecution, they were living apart, with appellant in Houston and Allen in Salt Lake City. On December 22, 1997, a young woman's body was found by the side of a roadway near Monticello, Utah. The body was not identified at that time. On December 30th, a missing persons report was filed on Allen and her daughter. The FBI and the Salt Lake City Police Department (SLCPD) began an investigation of the disappearances. Detective Kelly Kent of the SLCPD was one of the officers assigned to investigate. On January 15, 1998, the body found in Utah was identified as Allen's.

The following day, Special Agent Gary Steger, with the Houston Division of the FBI, contacted appellant at his apartment in Houston. Steger and another FBI agent introduced themselves and told appellant that they were investigating the disappearance of Allen and her child. They talked with appellant, received his permission to search the apartment, and conducted a search that revealed nothing of importance to the investigation. Special Agent Steger did see a crack pipe in the apartment. That same day, appellant called Detective Kent, with whom he had past dealings. Appellant told Kent that he, Allen, and Dominique had left Salt Lake City together but parted ways at St. George, Utah on December 21st. Appellant called Kent again on January 19th. This time he told her that he had taken Dominique to Hous-

ton and that a friend had taken her to Mexico.

On January 20th, appellant called Kent and told her that he had been in contact with the FBI and he believed that they were following him. That same day, the FBI searched appellant's apartment pursuant to a federal search warrant. Appellant told Special Agent Steger the revised story of taking Dominique to Houston and a friend taking her to Mexico. Appellant said that he had used Allen's van to drive from Salt Lake City to Houston, and he told FBI agents where the van was located. The van was seized by the FBI and Special Agent Steger returned appellant to his apartment.

On January 22nd, appellant was arrested by federal agents. Special Agent Eric Johnson read appellant his *Miranda* warnings and transported him to the Houston FBI office. Johnson testified that he did not threaten appellant or make any promises. Johnson denied that appellant was disoriented during this time period. During a pat-down search of appellant, Johnson discovered some phone cords and a necktie. During transit, appellant told officers that he should have made them kill him.

Appellant was turned over to Special Agent Steger at the Houston FBI office. Steger noticed that appellant had some scratches on his face and an injury to his wrist. The wrist injury consisted of a one-sixth of an inch deep slash across the wrist. Appellant told Steger that he had tried to slit his wrists the night before. Steger took appellant to a nurse for medical treatment. Afterwards, appellant was placed in an interrogation room for questioning. Also present in the interrogation room were Special Agent Steger, Detective Kent, and Charles Oliver, a homicide in-

---

7. *Guzman v. State,* 955 S.W.2d 85, 89 (Tex. Crim.App.1997).

vestigator for SLCPD. Steger read the *Miranda* warnings. Oliver testified that Steger read each warning individually, and after each one, Steger asked appellant if he understood his rights. Appellant appeared to understand his rights and appeared to knowingly, intelligently, and voluntarily waive the rights. Oliver further testified that appellant did not appear to be under the influence of drugs or alcohol. When asked questions, appellant responded coherently and appropriately. After warnings were read and rights waived, Detective Kent interviewed appellant.

Kent also testified that appellant appeared to understand the warnings. Kent observed that appellant read the waiver of rights form aloud and that appellant appeared to voluntarily, knowingly, and intelligently waive his rights. No promises, threats, or abuse of any kind occurred before or during the interrogation. According to Kent, appellant did not appear to be under the influence of drugs or alcohol, he appeared to understand what was going on, and when asked questions, he responded appropriately. This first interview by Kent was not electronically recorded. During the interview appellant admitted to killing both Allen and Dominique. Appellant related that, on December 24th, he killed Dominique, put her body in a suitcase, and buried the suitcase in an undeveloped area near the Sheldon Reservoir in northeast Harris County.

Appellant agreed to help locate Dominique's body. He went with law enforcement agents to the area he described and they attempted to find the victim's body. But the terrain was swampy and covered with underbrush, and appellant exhibited confusion about the body's location. Several law enforcement agents testified that they believed appellant was honestly trying to help locate the body but was unsuccessful. Appellant informed officers that the body could be further up the same road about a half mile.

After this failed attempt to find the child's body, Steger took appellant to the homicide division of the Houston Police Department. Appellant was placed in an interview room with Detective Kent and Houston Police Officer Robert King. King testified that he read appellant the required warnings and appellant nodded his head after each individual warning was read. Both King and Kent testified that appellant appeared to understand his rights and appeared to waive those rights voluntarily. Kent then conducted a videotaped interrogation of appellant. Kent and King both testified that appellant did not appear to be under the influence of drugs or alcohol during the interrogation and that appellant responded appropriately to questions. During the interrogation appellant again described how he killed Allen and Dominique and again described how he disposed of Dominique's body. Appellant also stated that he had used cocaine extensively up to and just prior to arrest, that he had recently attempted suicide by trying to slit his wrists, and that he had tried to kill himself by taking an overdose of pills shortly before his arrest. After the taping ended, appellant was shown a map, and he pointed out the area on the map where Dominique's body was located.

On January 23rd, armed with this information, law enforcement agents found Dominique's body. That same day, appellant submitted physical samples for toxicological testing, which later revealed the presence of cocaine in appellant's system.

At a hearing on appellant's motion to suppress evidence, appellant presented expert testimony from Dr. Paula Lundberg Love that a combination of stressful conditions, bipolar mental disorder, and cocaine binging rendered appellant incompetent to understand and waive his rights.

After hearing the evidence, the trial court found that appellant had knowingly, intelligently, and voluntarily waived his rights. The trial court held the complained-of statements to be admissible.

### b. *Analysis*

■ An inquiry into the waiver of *Miranda* rights "has two distinct dimensions."[8] First, the waiver must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception."[9] Second, the waiver must be made "with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it."[10] As to the voluntariness issue, appellant does not contend, and the record does not show, that law enforcement agents coerced appellant in any manner. "[T]he Fifth Amendment privilege is not concerned 'with moral and psychological pressures to confess emanating from sources other than official coercion.'"[11] If appellant's cocaine use and mental disorders alone impelled him to confess, that is of no constitutional consequence.

■ However, these factors are relevant to the second issue: whether he was aware of his rights and of the consequences of waiver. But such factors do not automatically determine the issue. Intoxication, for example, is but one relevant factor to consider in determining whether an accused understood his rights.[12] On the record before us, the trial court was clearly within its discretion in finding that appellant understood his rights and the effect of waiving those rights. Various law enforcement officials testified that appellant appeared to comprehend the warnings and the questions asked during interrogation, that appellant was coherent and gave appropriate answers to questions, and that appellant did not appear to be intoxicated by alcohol or under the influence of any drugs. Although appellant presented expert testimony that conflicted with that of the State's witnesses, the trial court was entitled to believe the State's witnesses rather than appellant's expert. Points of error one through twelve are overruled.

### 2. Psychiatric Testimony

■ In points of error thirteen and fourteen, appellant contends that the trial court erred in admitting into evidence the testimony of two jail psychiatrists who interviewed appellant while he was in custody. Appellant argues that, because he was given no *Miranda* warnings before the interviews and because counsel was not notified that the interviews would occur, admitting the psychiatric testimony was a violation of his Fifth Amendment right against self-incrimination and his Sixth Amendment right to counsel under *Estelle v. Smith.*[13]

The following colloquy occurred at trial:

8. *Colorado v. Spring*, 479 U.S. 564, 573, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987).

9. *Id.*

10. *Id.* However, the "Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege." *Id.* at 574, 107 S.Ct. 851. It is enough that the suspect "knows that he may choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time." *Id.*

11. *Colorado v. Connelly*, 479 U.S. 157, 170, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).

12. *Jones v. State*, 944 S.W.2d 642, 651 (Tex. Crim.App.1996), *cert. denied*, 522 U.S. 832, 118 S.Ct. 100, 139 L.Ed.2d 54 (1997).

13. 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1988). Although appellant alleges viola-

[DEFENSE]: It's my understanding they are going to bring a doctor from the jail who examined Mr. Ripkowski while he was in custody without the benefit of warnings-unless I'm mistaken about that. We would object to his testimony as a violation of Mr. Ripkowski's Fifth and Sixth Amendment rights, as well as on State constitutional grounds, and it's a violation of *Estelle v. Smith for them to conduct an in-custody psychological interview without the benefit of warnings. That's our argument.*

[PROSECUTION]: He requested the treatment. It was not at our request; it was at his request when he first came into the jail. It was a doctor, not the expert for the State. I won't go into any questions regarding the offense.

[DEFENSE]: I accept completely the way she represents it. We still think it's covered by *Estelle v. Smith* and would be a Fifth and Sixth Amendment violation, and we make that objection.

(Emphasis added).

In *Smith*, the trial judge ordered a psychiatric examination of the defendant to determine whether he was competent to stand trial.[14] The defendant was in custody at the time.[15] As a witness for the State in the punishment phase of trial, the psychiatrist expressed opinions tending to show that the defendant was a future danger to society.[16] The Supreme Court held

that the testimony violated the defendant's Fifth Amendment right against self-incrimination because he was not given *Miranda* warnings before he made statements in the interview that were ultimately used by the psychiatrist to form opinions about the defendant's future dangerousness.[17] The Court also found a violation of the Sixth Amendment's right to counsel because criminal proceedings had already been initiated by indictment, the defendant was represented by an attorney, and defense counsel was not notified that the psychiatric interview would encompass the issue of the defendant's future dangerousness.[18]

However, in *Buchanan v. Kentucky,*[19] the Supreme Court recognized limits to its holding in *Smith*. As in *Smith*, the interview in *Buchanan* was conducted without giving *Miranda* warnings to the defendant. But *Buchanan* presented three crucial distinguishing factors: (1) defense counsel had requested the psychiatric examination pursuant to Kentucky's involuntary hospitalization procedure, (2) the entire defense strategy revolved around establishing a mental status defense of extreme emotional disturbance, and (3) the State introduced the psychiatric testimony for the limited purpose of rebutting the defendant's mental status defense.[20] Under these circumstances, the Supreme Court found that there was

tions of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and violations of counterpart provisions in the Texas Constitution, his argument is based solely upon *Smith*. To the extent that the constitutional provisions cited might encompass other arguments, appellant has failed to adequately present them. *See Salazar* and *Wood, supra.*

14. *Smith*, 451 U.S. at 456–457, 101 S.Ct. 1866.

15. *Id.* at 467, 101 S.Ct. 1866.

16. *Id.* at 458–459, 101 S.Ct. 1866.

17. *Id.* at 467–469, 101 S.Ct. 1866.

18. *Id.* at 469–471, 101 S.Ct. 1866.

19. 483 U.S. 402, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987).

20. *Id.* at 423, 107 S.Ct. 2906.

no Fifth or Sixth Amendment violation.[21]

The facts in the present case are similar to those in *Buchanan*. The interviews with jail psychiatrists occurred because appellant requested treatment. At the guilt-innocence phase of trial, appellant offered expert testimony from Dr. Lundberg Love that appellant suffered from bipolar disorder. She based her opinion on a sixteen-hour personal interview of appellant, standardized psychological testing, a review of appellant's medical records, and a review of appellant's videotaped confession. This testimony was introduced to support appellant's contention that his oral statements were obtained without a knowing, intelligent, and voluntary waiver of his *Miranda* rights—an issue that was submitted to the jury. In response to appellant's expert testimony, the State presented testimony from the jail psychiatrists outlining their opinions that appellant did not suffer from bipolar disorder and the reasons behind those opinions. The State's proposed testimony was limited in scope, as evidenced by the prosecutor's statement that she would not "go into any questions regarding the offense."

*Buchanan* resolves appellant's Fifth Amendment claim. Appellant initiated the contact with the jail psychiatrists and his discussions with them were a necessary part of determining whether he needed treatment. The State introduced the testimony for the limited purpose of countering appellant's expert testimony, which was based in part on a personal interview of appellant. Appellant cannot now use his silence to "deprive the State of the only effective means it has of controverting his proof on an issue that he interjected into the case." [22]

■ As for appellant's Sixth Amendment claim, he failed to properly preserve the issue for review. Although appellant cited the Sixth Amendment and *Smith*, the only reason he gave for the impropriety of the testimony was the failure to give warnings. In *Smith*, the violation of the Sixth Amendment's right to counsel turned upon the State's failure to inform defense counsel regarding one of the topics of the examination.[23] So, while appellant had specifically articulated the basis for his Fifth Amendment *Smith* claim (the absence of warnings), he failed to articulate the basis for a Sixth Amendment *Smith* claim (failure to inform counsel of the existence and/or subject of the interview). The trial court was not placed on notice that appellant was alleging a Sixth Amendment violation *distinct* from the failure to give warnings, and in fact, counsel's statement could be taken to mean that the failure to give warnings was the *only* argument being advanced. Because the Sixth Amendment claim was not articulated "with sufficient specificity to make the trial court aware of the complaint," the Sixth Amendment aspect of *Smith* was procedurally defaulted.[24]

■ Even if it had been preserved, however, appellant's Sixth Amendment claim would fail. The only fact distinguishing this case from *Buchanan* is that appellant personally sought out psychiatric services instead of counsel seeking the examination on his behalf. Although it is generally more difficult to waive a Sixth Amendment right to counsel than to waive a Fifth Amendment right to remain silent, defendants are not precluded altogether from waiving the Sixth Amendment right

21. *Id.* at 423–425, 107 S.Ct. 2906.

22. *Smith*, 451 U.S. at 465, 101 S.Ct. 1866.

23. *Id.* at 471, 101 S.Ct. 1866; *Buchanan*, 483 U.S. at 423, 107 S.Ct. 2906.

24. Tex.R.App. P. 33.1(a)(1)(A).

to counsel on their own (i.e. without consulting counsel):

> A defendant's right to rely on counsel as a "medium" between the defendant and the State attaches upon the initiation of formal charges [citation omitted] and respondent's contention that a defendant cannot execute a valid waiver of the right to counsel without first speaking to an attorney is foreclosed by our decision in *Patterson [v. Illinois*, 487 U.S. 285, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988) ]. Moreover, respondent's view would render the prophylactic rule adopted in [*Michigan v.*] *Jackson*, [475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986) ] wholly unnecessary, because even waivers given during defendant-initiated conversations would be *per se* involuntary or otherwise invalid, unless counsel were first notified. Although a defendant may sometimes later regret his decision to speak with police, the Sixth Amendment does not disable a criminal defendant from exercising his free will. To hold that a defendant is inherently incapable of relinquishing his right to counsel once it is invoked would be "to imprison a man in his privileges and call it the Constitution" [citation omitted].[25]

Here, appellant effectively relinquished his counsel's assistance by seeking out mental health treatment on his own. Appellant has not alleged that he was ever denied the opportunity to consult with counsel before he sought such treatment. And

appellant's claim is undermined by the fact that the evidence was used for impeachment, rather than in the State's case-in-chief. The Supreme Court has recognized that some rules designed to enforce the Sixth Amendment right to counsel do not apply to impeachment evidence.[26]

 Appellant contends, however, that the State reoffered this evidence at the punishment phase of trial to support a finding of future dangerousness. Assuming *arguendo* that consideration of this psychiatric testimony in the punishment phase of trial created some sort of Fifth or Sixth Amendment problem, the burden was upon appellant to timely request an appropriate limiting instruction.[27] Appellant did not request a limiting instruction at the time the trial court admitted the evidence, nor did he request one during the punishment phase at the time the State reoffered all the guilt phase evidence. Points of error thirteen and fourteen are overruled.

### 3. Mitigation Issue

In points of error fifteen through eighteen, appellant complains about his waiver of the mitigation special issue.[28] At the beginning of the punishment phase of trial, defense counsel complained to the trial court that his client was placed in an unfair position by being required to choose between the admission of victim impact evidence and the submission of the mitigation special issue. He requested that the

---

**25.** *Michigan v. Harvey*, 494 U.S. 344, 352–353, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990).

**26.** *Id.* at 351, 110 S.Ct. 1176 (questioning a defendant after the Sixth Amendment right to counsel has attached when the defendant did not initiate the conversation).

**27.** *Hammock v. State*, 46 S.W.3d 889, 895 (Tex.Crim.App.2001).

**28.** The mitigation special issue asks:

> Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

Article 37.071, § 2(e)(1).

trial court hold the "statute" (presumably referring to Article 37.071) unconstitutional, but the trial court denied this request. Defense counsel then told the trial court that the State had informed him of its intent to use victim impact testimony. Defense counsel further stated that it was his understanding that the trial court would be permitting this testimony, and the trial court confirmed his understanding to be correct. Defense counsel and appellant then requested that appellant be permitted to waive the mitigation special issue:

> MR. MORROW: Based on that then, Your Honor, and after counseling with Mr. Ripkowski and his family, it is our decision on his behalf to waive the mitigation special issue so that the victim impact testimony would no longer be admissible.
>
> THE COURT: Mr. Ripkowski, you heard Mr. Morrow, your lawyer, make that statement in the record. Do you agree?
>
> MR. RIPKOWSKI: Yes, sir.
>
> THE COURT: Do you wish to affirmatively waive and give up the right to have the issue of mitigation presented to the jury?
>
> MR. RIPKOWSKI: Yes, sir.
>
> THE COURT: You understand if you do that, they will have just the one issue left, and that would be what we call the future dangerousness issue, and then if they answer that in the affirmative, then the Court would assess your punishment at death. Do you understand that?
>
> MR. RIPKOWSKI: Yes, sir.

THE COURT: Knowing all of this, has anyone promised you anything or threatened you to do it this way?

> MR. RIPKOWSKI: No, sir.
>
> THE COURT: And, that's what you want to do, is to give up any right to have the issue of mitigation presented to the jury?
>
> MR. RIPKOWSKI: Yes, sir.

As a result of this colloquy, the mitigation issue was not submitted in the punishment charge, and the State was not permitted to introduce victim impact testimony.

Appellant now contends that the trial court erred in denying his challenge to the constitutionality of Article 37.071. He contends that the statute, as interpreted by our decision in *Mosley v. State*,[29] nullifies the Supreme Court's decision in *Penry v. Lynaugh*[30] by forcing the defendant to choose between the mitigation issue and victim impact testimony. Alternatively, appellant contends that *Tong v. State*[31] retracted the rule permitting waiver of the mitigation special issue, and hence appellant's waiver was invalid. In addition, appellant claims that trial counsel was rendered ineffective because either (1) he was forced to choose between two detrimental actions, or (2) the inability to waive the issue means that counsel conveyed incorrect sentencing information to the defendant.

#### a. *Authority to Withdraw the Issue*

██ The first difficulty appellant's claims face is the estoppel rule recognized in *Prystash v. State*.[32] In *Prystash*, the defense asked the trial court not to submit

---

**29.** 983 S.W.2d 249 (Tex.Crim.App.1998), *cert. denied,* 526 U.S. 1070, 119 S.Ct. 1466, 143 L.Ed.2d 550 (1999).

**30.** 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).

**31.** 25 S.W.3d 707 (Tex.Crim.App.2000).

**32.** 3 S.W.3d 522 (Tex.Crim.App.1999), *cert. denied,* 529 U.S. 1102, 120 S.Ct. 1840, 146 L.Ed.2d 782 (2000).

the anti-parties special issue.[33] We held that the defendant was estopped from complaining on appeal about the absence of the issue-regardless of whether the issue was waivable.[34] We reasoned that a crucial distinction exists between the concepts of "waiver" and "invited error": "The question was not whether [appellant] could waive a right, it was whether he could complain of an action he requested."[35] We held that the definition of what can constitute error "excludes those actions of the trial court actually sought by the party to that tribunal."[36] Although *Mosley* distinguished *Powell v. State*[37] by emphasizing the differences between the deliberateness and mitigation special issues,[38] *Prystash* subsequently overruled *Powell* by holding that a party could estop himself from complaining about the failure to submit *any* issue, regardless of the nature of the issue involved.[39] Thus, *Prystash*'s holding goes beyond *Mosley* in barring a defendant from complaining on appeal when he has procured the absence of a special issue. Even if *Mosley*'s dicta on waiving the mitigation issue were completely disavowed, *Prystash* would still stand as a bar to relief in this case. Because appellant requested that the mitigation issue be omitted, he cannot now complain about the trial court's alleged lack of authority to withdraw the issue from the jury's consideration.

Nothing in *Tong* contradicts this conclusion. The defendant in that case asserted that he had the right to waive the mitigation issue.[40] *Prystash* did not address whether a trial court was *required* to withdraw an issue from the jury's consideration at the defendant's request; rather, it held that a defendant cannot complain on appeal when he *succeeds* in having the issue so withdrawn. Moreover, *Tong* did not actually address whether a defendant has a right to waive the mitigation special issue. We simply held that the *Mosley* language about waiving the mitigation issue was *dicta;* we did not decide whether that *dicta* was a correct or incorrect rule of law.[41]

### b. Defense Counsel's Dilemma

▆▆▆▆ One might be able to argue that *Prystash*-estoppel consequences should not result from decisions that were not freely made. Appellant's challenge to the constitutionality of the statute and his ineffective assistance of counsel claims appear to invoke this type of argument. Appellant claims that counsel, and appellant himself, were forced to choose between two very undesirable courses of action. However, facing a dilemma is not enough to create an actionable claim. The Supreme Court has recognized that defendants are often required to make hard choices: "A hard choice is not the same as no choice."[42] At a minimum, for a dilem-

---

33. *Id.* at 529–530.

34. *Id.* at 531–532.

35. *Id.* at 531.

36. *Id.*

37. 897 S.W.2d 307 (Tex.Crim.App.1994), *overruled by Prystash v. State*, 3 S.W.3d 522 (Tex.Crim.App.1999).

38. *Mosley*, 983 S.W.2d at 264.

39. *Prystash*, 3 S.W.3d at 531–532.

40. *Tong*, 25 S.W.3d at 711.

41. *Tong*, 25 S.W.3d at 711, 711 n. 5.

42. *United States v. Martinez–Salazar*, 528 U.S. 304, 315, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000); *see also Payne v. Tennessee*, 501 U.S. 808, 823, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991).

ma to be considered "no choice," the competing options must all be illegal. If one of the options were legal, then the defendant could have chosen the legal option, and so would not have been forced to choose the improper course. While an all-illegal-options dilemma does not necessarily excuse the particular option chosen,[43] we will assume *arguendo* that such a dilemma could exempt a defendant from the estoppel considerations articulated in *Prystash.*

Appellant fails to present an all-illegal-options dilemma. In *Payne v. Tennessee,* the Supreme Court rejected the claim that the admission of victim impact evidence violates the United States Constitution.[44] Similarly, in *Mosley* we rejected the claim that the admission of victim impact evidence constituted a *per se* violation of our statutory scheme.[45] Instead, we held such evidence to be admissible, subject to limi-

tations imposed by Tex.R. Evid. 403.[46] Appellant does not allege that any of the State's proposed victim impact testimony would have been inadmissible under our law had the mitigation special issue been submitted. So, appellant does not dispute that he had at least one legal option: allow the admission of victim impact testimony by retaining the mitigation special issue. While that option may not have been a desirable one, it was a legal one, so appellant's "forced choice" claim must fail.[47]

 Finally, counsel's advice did not constitute inaccurate information. Appellant received exactly what counsel told him he would get: the withdrawal of the mitigation special issue in exchange for the exclusion of the State's proposed victim impact testimony. Points of error fifteen through eighteen are overruled.[48]

---

**43.** *See Butterfield v. State,* 992 S.W.2d 448, 451–452 (Tex.Crim.App.1999)(cruel trilemma of incrimination, contempt, and perjury does not excuse defendant from the consequences of perjury).

**44.** 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991).

**45.** 983 S.W.2d at 249.

**46.** *Id.*

**47.** By this discussion, we do not mean to imply that waiving the mitigation special issue constitutes an "illegal" option. We have simply assumed that part of appellant's claim for the purpose of argument without deciding the question.

**48.** The dissent advances a number of unfounded criticisms of this opinion's analysis of the mitigation issue. First, the dissent contends that this Court invited the error at issue by placing defense counsel in a Catch–22. This contention is essentially the same argument made by appellant that is answered in this opinion. Appellant has no constitutional right to be free of victim impact evidence. To the extent that *Mosley* sanctioned the ability to waive the mitigation issue in exchange for having victim impact evidence excluded, that

opinion actually offered defense counsel *greater* flexibility by affording an additional strategic option. This additional option may not give defendants an easy choice, but the difficulty of the choice does not invalidate the option given.

The dissent also contends that *Mosley* defied the language of Article 37.071 when it held that "aggravating" circumstances were relevant to the mitigation issue. The dissent supports this contention with definitions of the words "aggravate" and "mitigate." But words must be "read in context and construed according to the rules of grammar and usage." *Sanchez v. State,* 995 S.W.2d 677, 683 (Tex.Crim.App.1999) (citing TEX. GOV'T CODE § 311.011(a)). In *Mosley,* we pointed out that the mitigation issue asked whether the mitigating circumstances were "sufficient" to warrant imposing a life sentence. 983 S.W.2d at 263. In order to accurately determine whether mitigating circumstances are "sufficient," the factfinder must necessarily be permitted to consider aggravating circumstances. *Jackson v. State,* 992 S.W.2d 469, 478 (Tex.Crim.App.1999)(quoting *Mosley,* 983 S.W.2d at 263 n. 18).

The dissent next contends that the Court has "gradually extended the *Mosley* holding beyond its self-declared limits." The dissent

complains that subsequent decisions have eroded *Mosley*'s statement that victim-related evidence is relevant *only* to the mitigation special issue. This contention misperceives both the nature of *Mosley*'s holding and the subsequent cases. The dissent initially discusses two (unrelated) cases styled *Jackson v. State* which we will call *Donell Jackson* (*Jackson v. State*, 992 S.W.2d 469 (Tex.Crim. App.1999)) and *James Jackson* (*Jackson v. State*, 33 S.W.3d 828 (Tex.Crim.App.2000), *cert. denied* —— U.S. ——, 121 S.Ct. 2221, 150 L.Ed.2d 213 (2001)) for ease of reference. The dissent contends that *Donell Jackson* permitted the introduction of victim-related evidence without limiting the jury's consideration of the evidence to the mitigation issue. But the defendant in that case never claimed that he was denied a limiting instruction; he simply argued that victim impact evidence was inadmissible as a matter of law. *Donell Jackson*, 992 S.W.2d at 480. And in fact, we expressly reiterated the relevance of victim impact evidence to the mitigation issue: "We have recently held that victim impact testimony is admissible as relevant to the mitigation special issue, subject to the provisions of Tex.R. Evid. 403." *Id.* The dissent then complains that *James Jackson* relied upon a footnote in *Mosley* dicta to hold that victim-related evidence is relevant to the future dangerousness issue if the defendant is aware of the victim impact evidence at the time the crime was committed. However, the mitigation claim in *James Jackson* was part of an ineffective assistance claim, which complicates any attempt to draw from that opinion a holding regarding the evidentiary value of victim-related evidence. *See James Jackson*, 33 S.W.3d at 842 (Johnson, J. concurring)(Because the prosecutor's argument discussed victim impact evidence of which appellant was aware at the time he committed the murders ... it *arguably* pertained to the issue of future dangerousness). But, to the extent that the decision could be interpreted as holding "known" victim impact evidence to be relevant to future dangerousness, such a holding cannot be said to extend *Mosley* "beyond its self-declared limits" when *Mosley* anticipated the situation. *See Mosley*, 983 S.W.2d at 261 n. 16. The dissent further contends that *Solomon v. State*, 49 S.W.3d 356 (Tex.Crim.App. 2001) permitted the introduction of victim impact evidence "generally" without considering whether the defendant had knowledge of the impact on the victims that would

somehow be relevant to future dangerousness. But the only issue in *Solomon* was whether the trial court had erred in admitting the victim impact evidence. *Id.* at 365–367. In resolving that claim, we found the evidence to be relevant to the mitigation special issue. *Id.* at 366. The defendant in that case did not allege that he was entitled to a limiting instruction; so, we had no occasion to address whether the evidence had any relevance to other special issues. *See id.* at 371 n. 1 (Meyers, J. concurring). The dissent is in error to read *Solomon* as recognizing a "general" relevance of victim-related evidence to the special issues.

The dissent next criticizes the distinction made by *Prystash* between the concepts of waiver and invited error—contending that there is no real difference between the two. This is mistaken. The distinction between the two concepts centers upon whether a party has the right to insist upon waiver. For example, in *Prystash*, the trial court did not have to accede to the defendant's request to omit the special issue. The trial court could have refused the request, and the defendant would have no grounds to complain. However, because the defendant succeeded in having the special issue omitted, he was barred by the doctrine of invited error from complaining about its omission. On the other hand, *Mosley* suggested that a defendant may have a right to insist upon waiving the mitigation issue. That question would be ripe only in a case in which the trial court refused a requested waiver.

The dissent next contends that allowing defendants to waive submission of the mitigation issue violates *Penry* because the jury no longer has a vehicle for expressing its reasoned moral response to the defendant's proffer of mitigating evidence. But the lack of that vehicle would be the defendant's choice, made on the basis of strategic considerations, namely, the exclusion of damaging evidence that could not be excluded otherwise.

Finally, the dissent expresses concern about permitting the waiver of the other special issues, such as the anti-parties issue and the future dangerousness issue. The expressed concern is without merit. Whether or not a trial court may be required to omit the mitigation issue upon request, the trial court is not required to omit the future dangerousness and anti-parties issues because on those issues, the State carries the burden of proof. *See Mosley*, 983 S.W.2d at 264. Moreover, if defense counsel believes, in his considered judgment, that his client will benefit from the

### 4. Constitutionality of Child Murder Provision

In points of error nineteen through twenty-one, appellant contends that Texas Penal Code § 19.03(a)(8), which proscribes the killing of a child under age six, violates various provisions of the United States and Texas constitutions. He acknowledges that *Black v. State*[49] and *Henderson v. State*[50] decided these issues contrary to his position. We decline his invitation to revisit these holdings. Points of error nineteen through twenty-one are overruled.

### 5. Videotape and Photographs

■ In point of error twenty-two, appellant contends that the trial court violated Tex.R. Evid. 403[51] by admitting into evidence a videotape of the recovery of the victim's body. He claims that the videotape is cumulative of still photographs and of the defendant's statements describing the body's location. He also claims that the videotape unfairly prejudiced him through dramatization, close-ups of a decomposing body, and lingering camera angles. We have held in the past that a videotape and still photographs are not entirely cumulative of each other.[52] A videotape offers a panoramic view of the scene that still photographs often do not offer.[53] We have previously upheld the admission of a videotape of the crime scene against a Rule 403 claim that the evidence was unduly cumulative or caused undue delay.[54] We see little difference between the present situation and the facts of our prior case. Although appellant also claims unfair prejudice, we find that the videotape simply reflects the gruesomeness of the crime—and that is not a sufficient reason for excluding the evidence.[55] Point of error twenty-two is overruled.

■ In point of error twenty-three, appellant contends that the trial court violated Rule 403 in admitting into evidence color photographs of the victim's larynx, after it had been removed from the victim's throat. Appellant contends that the photographs were unfairly prejudicial because they depicted "massive mutilation caused by the surgery in performing an autopsy." But we have recently held that our "mutilation" cases do not apply to photographs depicting organs that have been

---

omission of a particular issue, and he persuades the trial court to omit the issue, it cannot be said that the defendant's interests were ill-served. On the other hand, if it is discovered that a particular attorney procured the omission of an issue without a valid trial strategy, then that conduct can be made the basis of a claim of ineffective assistance of counsel.

**49.** 26 S.W.3d 895, 896–899 (Tex.Crim.App. 2000).

**50.** 962 S.W.2d 544, 560–563 (Tex.Crim.App. 1997), *cert. denied*, 525 U.S. 978, 119 S.Ct. 437, 142 L.Ed.2d 357 (1998).

**51.** The rule provides:
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence.

**52.** *Matamoros v. State*, 901 S.W.2d 470, 476 (Tex.Crim.App.1995); *Ladd v. State*, 3 S.W.3d 547, 568–569 (Tex.Crim.App.1999), *cert. denied*, 529 U.S. 1070, 120 S.Ct. 1680, 146 L.Ed.2d 487 (2000).

**53.** *Matamoros, supra; see also* and *Ladd*, 3 S.W.3d at 568.

**54.** *Ladd*, 3 S.W.3d at 568–569.

**55.** *Jones v. State*, 982 S.W.2d 386, 394 (Tex. Crim.App.1998), *cert. denied*, 528 U.S. 985, 120 S.Ct. 444, 145 L.Ed.2d 362 (1999); *Sonnier v. State*, 913 S.W.2d 511, 519 (Tex.Crim. App.1995).

removed.[56] And appellant concedes that the photographs depicted bruising on the larynx that was not visible externally. Hence, the photographs were highly relevant to the manner of death-in this case, manual strangulation of the victim. Given the relevance of the photographs, we find that their probative value was not substantially outweighed by the danger of unfair prejudice.[57] Point of error twenty-three is overruled.

### 6. Parole Argument

 In point of error twenty-four, appellant contends that the trial court erred in overruling his objection to a prosecutorial argument about parole. During the prosecutor's closing argument at punishment, the following transpired:

> MR. HAWKINS [prosecutor]: Mr. Morrow spoke to you about the parole laws; but as you know, those are laws that can be changed when they need to.
>
> MR. MORROW: Excuse me, Mr. Hawkins. Judge, I object to him telling the jury they can disregard the Charge the Court's given to them and disregard the law.
>
> THE COURT: That's overruled.
>
> MR. HAWKINS: As Mr. Baker testified, we saw the changes in the '80s when the federal judge stepped in and the Prison Management Act took place and people began to serve a fraction of their time. But that's not what the issue asks. This issue, as Dr. Quijano admitted, doesn't ask if the defendant would constitute a continuing threat in prison or after prison or after serving 40 years in prison. That's not what you are being asked. The question for you, is

the defendant, as he sits here, here and now, is he a continuing threat to society?

> MR. MORROW: Pardon me. Judge, may I have a running objection to him asking the jury to disregard the law as given in the Charge?
>
> THE COURT: You certainly may, sir.

Appellant contends that the prosecutor's argument concerning the possibility that parole law could change in the future amounted to an admonition to the jury to disregard the law. Assuming *arguendo* that appellant's contention is correct, we find that appellant opened the door to this argument.

A defendant cannot complain of improper prosecutorial argument if he invited the argument.[58] In the present case, appellant requested and received a jury instruction informing the jury that a defendant given a life sentence in a capital murder case would not be eligible for parole for forty calendar years.

The defense also called as a witness William Baker, a regional supervisor for the Texas Department of Criminal Justice-Parole Division, who testified to the forty year eligibility requirement. In response to defense questioning on direct examination, Baker also testified that, over the years, the Legislature has gradually increased-and never reduced-the amount of time a capital life inmate must serve to become eligible for parole. Defense counsel also elicited testimony concerning the procedures followed by the Board of Pardons and Paroles and the factors taken into account by the Board in determining whether to release a particular inmate.

On cross-examination, the State elicited testimony-over defense objection-that rules regarding parole had changed in the

---

**56.** *Salazar,* 38 S.W.3d at 151–152.

**57.** *See id.* at 152–153.

**58.** *Wilson v. State,* 938 S.W.2d 57, 60 (Tex. Crim.App.1996).

past to permit some inmates to be released earlier. During argument, defense counsel contended, not only that appellant would be ineligible for parole for forty years, but also that appellant would *never be paroled:*

> 40 calendar years is how long someone spends in the penitentiary if you return a life sentence on capital murder, at a minimum. What else does Mr. Baker and the parole board care about? They care about whether or not the person's still a threat at the end of 40 calendar years. They care about, has he behaved himself in prison. And their primary concern, above all else, is the protection of society. The protection of society. So if you go to prison and misbehave, you are not going to even get out when 40 calendar years pass. It's a reasonable deduction from the evidence, I would suggest to you all, that Britt Ripkowski will never be paroled if you return a life sentence. Never.

We conclude that defense counsel invited the prosecutorial argument in question by: (1) eliciting testimony that parole laws had become tougher on inmates throughout the years, (2) eliciting testimony concerning the procedures of the Parole Board and the factors taken into account in determining whether to release someone, and (3) arguing that appellant would never be released on parole. Point of error twenty-four is overruled.

We affirm the judgment of the trial court.

WOMACK, J., joins the judgment of the Court, and, except for Part 3b, its opinion.

COCHRAN, J. filed a concurring opinion.

MEYERS, J. filed a dissenting opinion, joined by PRICE and JOHNSON, JJ.

COCHRAN, J., filed a concurring opinion.

I join the majority opinion. I add this short concurrence to suggest that both the majority and dissent make appellant's decision to forgo the mitigation issue more complex than it is. According to Tallulah Bankhead, "there is less in this than meets the eye."

Both the majority and dissent apparently agree that the mitigation question under article 37.071, § 2(e)(1) is a special issue legislatively enacted for the benefit of a capital murder defendant. It was enacted in the wake of *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), to ensure that a jury could consider and give effect to any and all potentially mitigating evidence, such as mental illness, mental retardation, child abuse, drug dependency, youth, good works, poverty, lack of education, or any other special circumstances, that a capital murder defendant might wish to offer. Neither the majority nor the dissent disagree that this is a fair and proper question which guides a jury in focusing its attention upon the individual moral culpability of the specific defendant.

Thus, the primary disagreement in this particular case seems to boil down to whether the defendant is entitled to make a fully informed, voluntary decision (one which is set out on the record and made with advice of counsel), to forego the submission of the mitigation issue in return for having any and all victim impact[1] evidence excluded. The answer seems simple

---

1. Presumably, by foregoing the mitigation special issue, the defendant would render irrelevant other "aggravating" evidence which would otherwise be relevant only to that mitigation special issue.

to me. Yes, the defendant is entitled to make this decision.

If the defendant decides that the "aggravating" evidence that would be admissible to counteract his mitigation evidence is more powerful than his own mitigating evidence, he must be allowed to intelligently and voluntarily decline the submission of that issue. The mitigation issue belongs to him. It is his statutory right to invoke and courts will presume he *does* invoke that special issue unless he specifically and explicitly declines it. Once he has clearly made that decision, however, he cannot later complain that he should not have been allowed to make that decision. Life is full of hard choices. This is one of them. It is a choice, however, that rightly belongs to the individual defendant with advice of his counsel.

I would not call this "invited error" or a "Catch–22." I would call it a strategic decision which belongs to the defendant. Once he makes that decision, the trial court and this Court should honor and uphold it.

With these comments, I join the majority.

MEYERS, J., filed a dissenting opinion, in which PRICE and JOHNSON, JJ., joined.

The majority holds that appellant "invited" error when he chose not to submit to the jury a special issue that, if answered in the affirmative, would have resulted in a life sentence. TEX.CODE CRIM. PROC. art. 37.071(g)[1]. If anyone invited the error at issue in this case, it was this Court.

The Catch–22 in which appellant found himself began with *Mosley v. State*, 983 S.W.2d 249 (Tex.Crim.App.1998), *cert. denied*, 526 U.S. 1070, 119 S.Ct. 1466, 143 L.Ed.2d 550 (1999). The majority in *Mosley* held that victim related evidence was relevant to the mitigation special issue and suggested that a defendant might be able to prevent such evidence from being introduced by waiving the mitigation issue. *Mosley*, 983 S.W.2d at 261–64. This holding transformed what was once a legislatively-mandated catch-all provision for considering a defendant's mitigating evidence, into an additional punishment issue by making *aggravating* evidence relevant to the issue of *mitigation*. *Mosley*, 983 S.W.2d at 268–273 (Meyers, J. dissenting); *Jackson v. State*, 992 S.W.2d 469, 478 (Tex. Crim.App.1999) (noting that *Mosley* "explained that *aggravating* circumstances may be relevant to determine whether a particular mitigating circumstance or set of circumstances is sufficient to warrant a life sentence") (emphasis added). The majority's holding in *Mosley* defied not only the meaning of mitigation itself,[2] but also the language of Article 37.071. *Mosley*, 983 S.W.2d at 268–73 (Meyers, J. dissenting). Moreover, the "majority" who held victim related evidence relevant to the mitigation issue was in truth non-existent.[3]

---

1. Unless otherwise indicated, all future references to Articles refer to the Code of Criminal Procedure.

2. *"Aggravate* in its proper sense is opposed to *mitigate* or *extenuate."* BRYAN A. GARNER, A DICTIONARY OF MODERN LEGAL USAGE (Oxford University Press, Inc.1987) at 29; *see also* BALLENTINE's LAW DICTIONARY 808 (3d ed.1969) (defining *mitigate* as a verb that means "[t]o lessen in severity or burden").

3. The majority in *Mosley* noted that victim character evidence was probably inadmissible under our previous case law. *Mosley*, 983 S.W.2d at 262. However, the majority asserted that in *Johnson v. State*, 1997 WL 209527 "a majority of this Court ... approved the introduction of victim character evidence." *Id. Johnson v. State* was a precarious "majority" opinion of four judges and one concurrence that was withdrawn on rehearing.

In *Mosley*, the Court explicitly limited the introduction to victim related evidence to the mitigation special issue, stating, "... victim impact and character evidence is relevant only insofar as it relates to the mitigation issue. Such evidence is patently irrelevant, for example, to a determination of future dangerousness." *Mosley*, 983 S.W.2d at 263. Gradually, however, the Court extended the *Mosley* holding far beyond its self-declared limits. In *Jackson v. State*, 992 S.W.2d 469, 480 (Tex. Crim.App.1999), a case that was tried prior to *Mosley*, the majority relied on the *Mosley* holding to permit the introduction of victim related evidence at the punishment stage of appellant's trial without limiting the jury's consideration of the evidence to the mitigation special issue. *Jackson*, 992 S.W.2d at 480–81. In a separate case, *Jackson v. State*, 33 S.W.3d 828, 833–34 (Tex.Crim.App.2000), *cert. denied*, —— U.S. ——, 121 S.Ct. 2221, 150 L.Ed.2d 213 (2001), the Court relied on a footnote in the *Mosley* dicta to hold that victim related evidence is relevant to the future dangerousness special issue if the defendant was aware of the victim impact evidence at the time the crime was committed. *Id.* Then, in *Solomon v. State*, 49 S.W.3d 356, 365–66 (Tex.Crim.App.2001), the Court permitted the introduction of victim impact evidence at the punishment stage generally without considering whether the defendant had knowledge of the impact on the victims that would somehow be relevant to the issue of future dangerousness; nor did

the Court address whether the victim impact evidence was relevant to the anti-parties special issue. *Id.*

To further complicate matters, this Court held, within the confines of a single opinion, that while it was not proper to determine whether a capital defendant is authorized to waive submission of a special issue in a capital case, if a defendant *does* waive submission of a special issue, he may not complain of such a waiver on appeal because he is not actually waiving the issue; he is "inviting error." *Prystash v. State*, 3 S.W.3d 522, 530–32 (Tex.Crim. App.1999), *cert. denied*, 529 U.S. 1102, 120 S.Ct. 1840, 146 L.Ed.2d 782 (2000). *See also Tong v. State*, 25 S.W.3d 707, 711 (Tex.Crim.App.2000) (noting issue of whether capital defendant may waive mitigation special issue remains unsettled under Texas law).

Today the majority would allow appellant to waive submission of the mitigation special issue through this thinly cloaked guise of "invited error."[4] I dissent because this Court owes a duty to future capital defendants to determine whether or not waiver of the mitigation—or any—special issue is permitted by Texas law. *Prystash* and the doctrine of "invited error" do not answer this question.

The majority writes: "[e]ven if *Mosley*'s dicta on waiving the mitigation issue were completely disavowed, *Prystash* would still stand as a bar to relief in this case" because appellant requested the waiver.

---

4. The concurring opinion joins the majority's result and opinion. *Ripkowski v. State*, 61 S.W.3d 378, 382 (Tex.Crim.App.2001) (Cochran, J. concurring). Nevertheless, it seems that the concurrence would deny relief based not on the notion of "invited error" but on the separate ground of waiver. Specifically, the concurrence suggests that appellant's decision was neither "invited error" nor a "Catch–22." *Id.* Rather, it is "a strategic decision which belongs to the defendant"—in essence, an issue the defendant may waive. *Id.* Unlike the "invited error" approach of the majority, however, this analysis would permit appellate review of the defendant's decision to waive the mitigation issue. In a properly briefed point of error, a defendant could argue on appeal that defense counsel's advice to the defendant to waive the mitigation issue constituted ineffective assistance of counsel.

Majority Op. at 389. The majority explains further that, "[n]othing in *Tong* contradicts this conclusion." *Id.* Nonetheless, despite embracing the illusion of "invited error," the majority's determination that *Prystash* controls the instant appeal conflicts directly with the teaching of *Tong*. *See Tong*, 25 S.W.3d at 711, 711 n. 5 (noting Court has not decided whether capital defendant may waive mitigation special issue).

The majority argues that there is a "crucial distinction" between the concepts of "waiver" and "invited error." Majority Op. at 389 (citing *Prystash*, 3 S.W.3d at 531). Certainly their names differ. But is there any meaningful distinction between the two concepts when "invited error" was used to overrule a case that held special issues involve absolute rights and are, therefore, not waivable? *See Prystash*, 3 S.W.3d at 530 (overruling *Powell*, 897 S.W.2d 307, 316 (Tex.Crim.App.1999), which held that the rights involved in giving a special issue are absolute, and therefore, not waivable). It seems not. And is it anything but legal acrobatics to hold that an appellant cannot complain of a waived issue on appeal, but that the issue may or may not be waivable? Again, it seems not.

At a minimum, to bring some measure of certainty and predictability to the punishment hearings of future capital litigants, the Court should admit that it is permitting waiver of the legislatively mandated mitigation special issue in a capital trial. To truly see that justice is served, however, the Court should consider the mitigation special issue separately from the anti-parties issue that the *Prystash* court considered. Several factors support this separate consideration.

First and foremost, if a justification for permitting a capital defendant to waive submission of the mitigation special issue

existed, it was allowing a defendant to prevent introduction of victim impact testimony. *Mosley*, 983 S.W.2d at 264. Because this Court has effectively permitted introduction of victim impact testimony on each of the special issues in article 37.071, this justification no longer exists. *Solomon*, 49 S.W.3d at 365–66 and *Jackson*, 992 S.W.2d at 480 (permitting general introduction of victim related evidence at punishment stage); *Jackson*, 33 S.W.3d at 833–34 (permitting introduction of victim related evidence on the issue of future dangerousness).

The special issue of mitigation also merits separate consideration from this Court because the United States Supreme Court has emphasized—and reemphasized—that a capital jury must have a vehicle for considering mitigating evidence. *Penry v. Lynaugh*, 492 U.S. 302, 327–28, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (holding defendant's death sentence violated Eighth Amendment for failure to give jury a vehicle to express its "reasoned moral response" to mitigating evidence that was outside scope of statutory special issues); *Penry v. Johnson*, 532 U.S. 782, 121 S.Ct. 1910, 1920–24, 150 L.Ed.2d 9 (holding supplementary instruction for jury to nullify its answers to special issues if it found mitigating circumstances warranted life sentence insufficient to meet dictates of *Penry I* ). If we allow capital defendants to "invite error" and waive submission of this issue, the jury no longer has a vehicle to express its "reasoned moral response" to a defendant's proffer of mitigating evidence, and we run afoul of the United States Constitution as we did in the pre—*Penry* version of our death penalty scheme.

Finally, if we allow a capital defendant to waive this special issue, do we continue to allow a defendant to waive the anti-parties issue? The future dangerousness

issue? *All* of the special issues? Just how much error will we allow a capital defendant to "invite?" The sanction here is the harshest, the room for error nil. We cannot shirk our constitutional duties by hiding behind the cloak of "invited error." Therefore, I dissent.