COURT OF APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH
 
NO. 2-03-332-CR
  
  
HAROLD 
GENE CABLE, JR.                                                     APPELLANT
  
V.
  
THE 
STATE OF TEXAS                                                                  STATE
 
  
------------
 
FROM 
THE 97TH DISTRICT COURT OF MONTAGUE COUNTY
 
------------
 
MEMORANDUM OPINION[1]
 
------------
        A 
jury convicted Appellant Harold Gene Cable of murder upon his plea of guilty, 
and, rejecting his sudden passion defense, assessed his punishment at life 
imprisonment in the Institutional Division of the Texas Department of Criminal 
Justice and a $10,000 fine.  The trial court sentenced him 
accordingly.  Appellant brings a single point on appeal, challenging the 
trial court’s denial of his motion to suppress. Because we hold that the trial 
court correctly denied the motion to suppress, we affirm the trial court’s 
judgment.
        The 
evidence showed that on October 16, 2002, Appellant and his girlfriend, Carol 
Sanderson, were shooting guns in a wooded area near his parents’ lake 
cabin.  Appellant called his family members and asked them to come to the 
lake cabin because something terrible had happened.  When Appellant’s 
parents and sister arrived, Appellant told them that he had shot Sanderson in a 
hunting accident as they walked through the woods around the cabin but that no 
one would believe that it was an accident. Appellant’s family called 911 to 
report the shooting.  Appellant ran off into the woods before the police or 
ambulance personnel arrived.
        Over 
the next several hours, police and emergency personnel searched for Sanderson to 
determine whether she was dead or alive, but they could not locate her.  
Appellant finally reappeared at the cabin at around 8:20 p.m.  A number of 
people were present, including police, emergency personnel, and family and 
friends of Appellant.  Sheriff Chris Hamilton asked Appellant to step into 
a van the police were using as a mobile command center.  Hamilton and Texas 
Ranger Dwayne Dockery wanted to speak privately with Appellant without anyone 
eavesdropping.  The record reflects that Appellant was not under arrest at 
that point because neither Sheriff Hamilton nor Ranger Dockery believed probable 
cause existed.
        When 
Ranger Dockery asked Appellant if he would talk to them about what had happened, 
he responded that he did not want to talk to the officers until he talked to an 
attorney.  He did agree, however, to show the officers where he had left 
Sanderson in the woods.  Appellant led the officers into the woods.  
Before crossing a barbed-wired fence, Ranger Dockery realized that he and 
Sheriff Hamilton had not checked Appellant for weapons.  As a safety 
precaution, Dockery asked Appellant if he had any weapons on his person.  
In response to Dockery’s question, Appellant stated that he did not have any 
weapons and that the police officers already had the weapon that he “did it 
with.”  Dockery frisked Appellant anyway, and, after Dockery discovered 
no weapons, Appellant continued to lead Dockery and Hamilton deeper into the 
woods to Sanderson.
        The 
record reflects that as Dockery and Hamilton followed Appellant into the woods, 
they did not question him. Even though they did not question Appellant, they 
testified that he began to volunteer statements about the circumstances of the 
shooting.  Dockery testified that Appellant stated:
  
he had been seeing the victim for a while and that he had been drinking vodka 
since early that morning.  They had got[ten] into an argument, and [he] 
just went off.
. 
. . .
 
He 
said that he had told his dad it was an accident, but the only accident was what 
he had done.  What I did.
 
  
Both 
officers claimed that they simply listened to statements Appellant made without 
asking him to clarify or explain.  At one point late in the search, 
Appellant told Dockery that he “was going on the run, but he decided that 
wasn’t the best thing to do.”  Appellant asked Dockery whether Dockery 
thought “that [was] the best thing to do, get it taken care of.”  
Dockery responded, “I think we just need to take care of this.” Appellant 
led Dockery and Hamilton to Sanderson’s body, which was located near a stock 
pond. Sanderson appeared to have been shot twice, and the officers decided they 
had probable cause to arrest Appellant for the murder of Sanderson.  They 
placed Appellant under arrest and gave him his Miranda[2] 
warnings.  He refused to make any further statements.
        After 
a hearing on Appellant’s motion to suppress his statements, the trial court 
found that the statements were voluntary, noncustodial statements and denied 
Appellant’s motion to suppress.  Appellant correctly argues that an 
essential question is whether he was in custody at the time he made the 
statements.
        In 
Miranda the United States Supreme Court was unequivocal in holding that 
an accused who is held in custody must be given the required warning before any 
questioning.[3]  The United States Supreme Court 
defines custodial interrogation in Miranda as “questioning initiated by 
law enforcement officers after a person has been taken into custody or otherwise 
deprived of his freedom of action in any significant way.”[4]  
When law enforcement officers fail to warn a person in custody, the State 
forfeits the use of any statement obtained from that interrogation during its 
case-in-chief.[5]
        We 
do not base our determination of whether an accused was in custody upon whether 
a police officer has spoken the words “arrest” or “in custody.”[6]  Although the Texas Court of Criminal Appeals has, in 
the past, utilized a four-factor test in determining whether someone is in 
custody, the court discontinued this practice in Dowthitt v. State in 
favor of determining custody “on an ad hoc basis, after considering all 
of the (objective) circumstances.”[7]  Under Dowthitt, 
custody is established when: (1) an officer has probable cause to arrest a 
suspect and does not tell him that he is free to leave; (2) the officer 
manifests this knowledge to the suspect; and (3) a reasonable person in a 
suspect’s position would believe that he is under restraint to the degree 
associated with an arrest.[8]  The ultimate 
inquiry is whether there was a formal arrest or restraint on freedom of movement 
of the degree associated with formal arrest.[9]  
This determination depends on the objective circumstances, not on the subjective 
views of either the interrogating officers or the person being questioned.[10]
        The 
officers in the case now before this court testified that they did not have 
probable cause to arrest when they first began talking to Appellant.  
Appellant testified and did not contradict any essential statement by the 
officers.  Appellant had admitted to shooting Sanderson, but claimed it was 
an accident.  The officers did not know whether Sanderson was dead or alive 
when they first began talking to Appellant.  They had not examined her 
injuries, and they had no information other than Appellant’s statement that 
the injury to Sanderson was accidental.  The officers’ primary concern at 
the time they talked to Appellant at the command center was to locate Sanderson 
in case she could benefit from medical treatment.  Appellant offered to 
take them to Sanderson but informed them without having received the Miranda 
warning that he did not want to talk to them until he talked to a lawyer.
        The 
uncontroverted testimony is that the statements Appellant made after that point 
were volunteered, except for the statement regarding his not having a weapon on 
his person.  We see no significant difference between asking Appellant if 
he was carrying a weapon and searching him to determine whether he was carrying 
a weapon.  The pat-down search was, of course, lawful.[11]  
We hold that this single inquiry does not constitute questioning under the facts 
of this case.  Additionally, Appellant indicated that he believed he was 
free to leave by discussing with the police officers the benefit of running 
away.
        In 
reviewing a ruling on a motion to suppress, we review de novo the trial 
court’s rulings on application of law to fact questions that do not turn upon 
credibility and demeanor.[12]  Because Appellant 
did not controvert the testimony of the officers in any material way, the de 
novo standard applies.  Applying this standard of review, we hold that when 
Appellant was assisting Sheriff Hamilton and Ranger Dockery to locate Sanderson, 
he was not in custody as contemplated by Miranda.  Additionally, we 
point out that even if he had been in custody, the inculpatory statements he 
made were volunteered and not in response to questioning by law enforcement 
officers.
        We 
hold, therefore, that the trial court did not abuse its discretion in overruling 
Appellant’s motion to suppress his statements. We overrule Appellant’s sole 
point and affirm the trial court’s judgment.
 
 
                                                          LEE 
ANN DAUPHINOT
                                                          JUSTICE
 
 
PANEL 
A:   LIVINGSTON, DAUPHINOT, and MCCOY, JJ.
 
DO 
NOT PUBLISH
Tex. R. App. P. 47.2(b)
 
DELIVERED: 
April 28, 2005
 


NOTES
1.  
See Tex. R. App. P. 47.4.
2.  
Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966).
3.  
Id. at 444, 86 S. Ct. at 1612.
4.  
Id.
5.  
Jones v. State, 119 S.W.3d 766, 772 (Tex. Crim. App.), cert. denied, 
124 S. Ct. 2836 (2004).
6.  
Oregon v. Mathiason, 429 U.S. 492, 495, 97 S. Ct. 711, 713-14 (1977).
7.  
931 S.W.2d 244, 254-55 (Tex. Crim. App. 1996) (emphasis added).
8.  
Id. at 255.
9.  
Stansbury v. California, 511 U.S. 318, 322, 114 S. Ct. 1526, 1528-29 
(1994).
10.  
Id. at 322-23, 114 S. Ct. at 1528-29.
11.  
See Terry v. Ohio, 392 U.S. 1, 24-25, 88 S. Ct. 1868, 1881-82 (1968).
12.  
Ripkowski v. State, 61 S.W.3d 378, 381-82 (Tex. Crim. App.), cert. 
denied, 539 U.S. 916 (2003); Guzman v. State, 955 S.W.2d 85, 89 (Tex. 
Crim. App. 1997).