NO. 07-00-0116-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL E

SEPTEMBER 17, 2002

_____

FRANCISCO GARCIA, JR., APPELLANT

V.

THE STATE OF TEXAS, APPELLEE

_____

FROM THE 242ND DISTRICT COURT OF HALE COUNTY;

NO. B12033-9504; HONORABLE ED SELF, JUDGE

_____

Before QUINN and REAVIS, JJ. and BOYD, SJ.[1]

Appellant Francisco Garcia, Jr. was convicted of capital murder in the death of his five-month-old stepdaughter, as well as serious bodily injury to a child with respect to the same incident. He was sentenced to life imprisonment in the Institutional Division of the Department of Criminal Justice for the offense in the first count of the indictment and 99

_____

[1]John T. Boyd, Chief Justice (Ret.), Seventh Court of Appeals, sitting by assignment.

years confinement for the offense in the second count with the sentences to run concurrently. He appeals from those convictions in eight issues, in which he challenges the legal sufficiency of the evidence to sustain the conviction of capital murder in his first four issues, the factual sufficiency of the evidence to sustain the conviction of capital murder in his fifth issue, and the factual sufficiency of the evidence to sustain the punishment imposed in his sixth issue. In his seventh and eighth issues, he complains that the trial court erred in overruling his motion to find that section 19.03(a)(8) of the Penal Code is unconstitutional and in declaring Irene Ramos to be a defense witness when called to testify during the defense's case-in-chief. Disagreeing with appellant that reversal is required, we affirm the convictions.

On April 3, 1995, appellant, who had recently been laid off from his job, was left alone to care for two of the children of his common-law wife, Irene Ramos, while she was at work. Those children included 15-month-old Phillip Ramos, whose paternity was listed on his birth certificate as unknown, and five-month-old Amanda Garcia, whose father was Raymond Garcia, appellant's brother.[2] The day before, Amanda had been hit in the face with a toy truck by Phillip and taken to the emergency room, where she was later released. Amanda did not appear to be suffering any effects from that incident, other than a bruise on the side of her face, while in appellant's care the next day. Irene called appellant

_____

[2]There were also two other children living in the home who were not present on that particular day. They were six-year-old Angela Garcia, appellant's daughter, and four-year-old Ashley Garcia, who was the daughter of Raymond Garcia. Appellant apparently did not have knowledge that he was not the father of Ashley until after the incident, which forms the basis of appellant's convictions.

sometime during the day to tell him that she could not take him to Lubbock to obtain a copy of his birth certificate and social security card because her replacement had not arrived at work. She told him to call the babysitter to come get the children. Appellant got the children ready to go to the babysitter when he noticed Amanda was having trouble breathing. He called his wife at work and told her to come home. Meanwhile, the babysitter arrived, and he told her to go get Irene. When Irene arrived at the house, she instructed appellant to call 911. Emergency personnel transported Amanda to the hospital, where she died several days later from blunt force injuries to the head caused either by impact or by shaking.

In his first four issues, appellant challenges the legal sufficiency of the evidence by claiming his conviction[3] (1) is in violation of article 38.03 of the Code of Criminal Procedure and section 2.01 of the Penal Code, (2) deprives him of due process of law under both the United States and Texas Constitutions, (3) deprives him of effective assistance of counsel under both the United States and Texas Constitutions, and (4) deprives him of effective compulsory process of law under both the United States and Texas Constitutions. In his fifth issue, appellant challenges the factual sufficiency of the evidence. Appellant argues his first four issues together, and we will likewise discuss them in the same manner. We will also discuss appellant's factual sufficiency challenge at the same time. Further, appellant does not specifically refer in his argument to the statutory and constitutional violations he claims in his issues other than to cite that article 38.03 of the Code of Criminal

---

[3]Appellant appears to make this argument only with respect to the first count of capital murder.

Procedure and section 2.01 of the Penal Code do not permit a person to be convicted of an offense unless each element is proved beyond a reasonable doubt.  We will therefore not discuss those statutory and constitutional issues separately and will only address them as they relate to the standard of review we are required to use in our analysis of appellant's issues.

The standard by which we review the legal sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Under a factual sufficiency review, we neutrally examine all of the evidence and determine whether it is so weak as to be clearly wrong and manifestly unjust or the adverse finding is against the great weight and preponderance of the evidence.  *Johnson v. State*, 23 S.W.3d 1, 11 (Tex.Crim.App. 2000); *Clewis v. State*, 922 S.W.2d 126, 135 (Tex.Crim.App. 1996).

With respect to the first count of the indictment, the jury was instructed that, to convict appellant, they must find that he intentionally or knowingly caused the death of Amanda Garcia by hitting her with his hand or shaking her.  The jury was further instructed that a person acts intentionally with respect to a result of his conduct when it is his conscious objective or desire to cause the result and acts knowingly with respect to the result of his conduct when he is aware that his conduct is reasonably certain to cause the result.  Appellant argues that there is not any evidence to substantiate the allegations with

4

respect to his mental state and his ability to cause the injuries sustained. In support of this argument, he refers to testimony that he cared for the children, prepared their meals, washed their clothes, played with them, planned parties for them, and bought them gifts. He also cites to evidence that he rode with Amanda to the hospital, thereby demonstrating his concern. Further, he posits, even though a pathologist for the State testified that the force which caused Amanda's death could have come from a high fall or from a strong blow from the hand, there is no evidence concerning such a fall or testimony as to appellant's strength.

However, appellant voluntarily gave a statement[4] to police in which he admits he was frustrated because Amanda was crying and would not take her bottle or pacifier. Further, he concedes he did not want to pick up Amanda because he was upset that she was his brother's child and was mad about seeing pictures of his brother in a photo album the night before. During times when appellant had been in prison, Irene and his brother had affairs. Appellant described his actions with respect to Amanda as follows:

\* \* \*

> I just stood there in front of Amanda crying and got more mad and the rage built up inside of me. I lost control of everything and I slapped Amanda across the face with my left hand. I was in so much rage that I dont [sic] know how hard I hit her. I hit her right across the bruise that she had where Philip had hit her with the toy. Right after this Amanda stopped crying.

\* \* \*

---

[4]Appellant had given a prior statement in which he did not mention striking Amanda, but stated only that he had found her gasping for breath after he put her in her crib. He also described the prior incident in which Phillip struck Amanda with a toy truck.

5

Amanda was in the hospital two days before she died there. The doctors told us that she had died as a result of the head injury. When the doctors told us this I got all scared and thought why had this happened to me. I knew that she had died as a result of me hitting her across the face.

When I hit Amanda across the face that morning I didnt [sic] intend to kill her. I guess that when I slapped Amanda that morning I was getting back at my brother.

\* \* \*

There was also evidence that appellant had not wanted to take Amanda to the hospital for the injury from the toy truck the night before and sat in the car while Irene took the child into the hospital to be examined. Further, although he admits that after striking Amanda, she "was just laying there with her eyes open," he merely placed her in the crib. When he later discovered that she was gasping for air and non-responsive, he called Irene to come home, but did not call 911 until after she arrived and told him to call. At the hospital, he told Irene to stop crying because people would think they had done something to the child.

Dr. Jerry Spencer, the Lubbock County Medical Examiner at the time of the death, stated that Amanda's injuries were very severe and would require a severe impact or severe shaking. Further, a child would generally have to fall at least 10 feet to receive the kind of injuries that Amanda had, and the head was impacted while it was still. Although the injuries were consistent with being hit with an open hand on the side of the head, they were not consistent with a 15-month-old child hitting Amanda with a toy truck. Additionally, Dr. Richard E. George, Jr., the neurosurgeon who operated on Amanda, described the injuries:

6

When we have patients who have bleeding over the surface of the brain, when we have bleeding into the eyes, that is an injury that is associated with severe shaking. It is a forceful event that causes the vessels to hemorrhage in the eyes, themselves, and also for the blood vessels over the surface of the brain to break and cause bleeding in the brain. It can injure the brain, lacerate the brain, or tear the brain. So that was suggestive of a shaking injury.

The blow to the back of the head suggested a significant impact to the back of the head. There was also the bruising in the front that suggest [sic] that there had been a blow at the front of the head as well.

When I assessed Amanda, I felt that she had sustained a severe shaking injury, with the evidence of trauma to the back of the head that appeared to be what we would call a shaken impact syndrome where they're shaken in a forceful blow to the back of the head. And that was our diagnosis at the time.

He further opined that for hemorrhaging on the surface of the brain and into the eyes to be present, forceful shaking and not a single blunt blow to the head was required.

Mental culpability for murder must generally be inferred by the circumstances under which the death occurred. *Matter of V.M.D.,* 974 S.W.2d 332, 347 (Tex.App.--San Antonio 1998, no pet.). Intent to kill may be inferred from acts, words, and the conduct of the accused or from the extent of the injuries and relative size and strength of the parties. *Patrick v. State*, 906 S.W.2d 481, 487 (Tex.Crim.App. 1995), *cert. denied,* 517 U.S. 1106, 116 S.Ct. 1323, 134 L.Ed.2d 475 (1996). Statements by the accused to the effect that he did not mean to kill may not be sufficient to overcome evidence of intent created by the circumstances. *See Wesbrook v. State,* 29 S.W.3d 103, 112 (Tex.Crim.App. 2000), *cert. denied,* 532 U.S. 944, 121 S.Ct. 1407, 149 L.Ed.2d 349 (2001); *Motilla v. State,* 38 S.W.3d 821, 824-26 (Tex.App.--Houston [14[th] Dist.] 2001), *rev'd on other grounds,* No. 598-01, slip

op., 2002 WL 1380912 (Tex.Crim.App. June 26, 2002). The same is true of evidence that the accused had a loving relationship with a child victim. *See Robbins v. State*, 27 S.W.3d 245, 248-49 (Tex.App.--Beaumont 2000, pet. granted).

Given the facts that appellant had been alone with the child prior to her experiencing breathing difficulties, his description of his rage and his admission of having struck her, and the severity and extent of Amanda's injuries, the evidence is both legally and factually sufficient to support the verdict. A violent assault on a child may reasonably be expected to cause death. *Lindsey v. State*, 501 S.W.2d 647, 648 (Tex.Crim.App. 1973), *cert. denied,* 416 U.S. 944, 94 S.Ct. 1953, 40 L.Ed.2d 296 (1974). Therefore, a jury could have rationally found that appellant intentionally or knowingly caused the death of Amanda within the definitions prescribed, and that finding is not clearly wrong or manifestly unjust. Appellant's first five issues are overruled.

In his sixth issue, appellant challenges the factual sufficiency of the evidence to sustain the punishment assessed. In making his argument, he merely asserts that he was a relatively young age at the time of the offense[5] and does not have such a criminal history as to render him unfit for rehabilitation. Further, he states that his acts do not show malice toward the victim, but show him as a loving and caring parent who changed Amanda's diapers, fed her, bathed her, washed her clothes, planned parties for her, and purchased gifts for her.

---

[5]Appellant does not specify his age at the time of the offense in his brief.

Appellant does not specify if he is challenging the punishment assessed for both convictions. Since he was charged with capital murder and the State sought the death penalty, the statutorily prescribed punishment was either death or imprisonment in the Institutional Division for life. Tex. Pen. Code Ann. § 12.31(a) (Vernon 1994). The jury answered "yes" to the following special issues: (1) whether there is a probability appellant will commit criminal acts of violence that constitute a continuing threat to society, and (2) whether there are sufficient mitigating circumstances to warrant life imprisonment rather than death. Because of the jury's answer to the second special issue, appellant received the lesser of the two mandatory punishments for the crime. It has also been held that a court should not review a factual sufficiency challenge to a finding of probability of future dangerousness. *McGinn v. State*, 961 S.W.2d 161, 169 (Tex.Crim.App. 1998). Therefore, we will assume that appellant is contesting the sufficiency of the evidence to support his conviction for serious bodily injury to a child in which the jury was given the option of assessing a punishment of not less than 25 years or more than 99 years imprisonment, with the jury choosing the maximum punishment.

The evidence at the punishment hearing showed appellant had been previously convicted of burglary of a building, for which his probation was revoked. He had also been convicted of burglary of a habitation and forgery, which were alleged in the indictment for enhancement purposes. Additionally, Irene testified that appellant assaulted her when she was four months pregnant with her son Phillip and that two weeks after the birth of her daughter Ashley, she had left the baby with appellant and when she returned the baby had a big lump on her head, which appellant claimed not to know about. Ashley was in the

9

hospital two weeks with the injury, even though the investigation of Child Protective Services was inconclusive. Further, Irene's father, Joe Ramos, stated that his granddaughter Angela once came up to him with blood in her mouth and nose and, because he believed appellant hit her, he slapped appellant. Appellant's mother Guadalupe Garcia also averred that on one occasion when appellant was angry with Irene, her other son was trying to calm appellant, she got in the way and was punched in the nose by appellant. Multiple law enforcement witnesses additionally testified that appellant's reputation for being peaceful and law abiding was bad, although he was apparently well behaved as a prisoner. Even in light of the evidence pointed out by appellant in his favor, he had multiple prior criminal convictions and there was evidence of prior assaults from which the jury could have found that he had a violent nature. Thus, we cannot find that the evidence was factually insufficient to support a sentence at the maximum end of the range of punishment allowed by law. Appellant's sixth issue is overruled.

Appellant complains in his seventh issue that section 19.03(a)(8) of the Penal Code, under which he was prosecuted for capital murder, is unconstitutional. That section provides that a person commits an offense if he commits murder as defined under section 19.02(b)(1) of the Penal Code and the person murders an individual under six years of age. Tex. Pen. Code Ann. § 19.03(a)(8) (Vernon 1994). Appellant argues that the statute violates the equal protection laws of the federal and state constitutions because the selection of the age of six years is arbitrary and wrongfully discriminates against those similarly situated because a child who is six years and one day old is not more able to

protect himself than a child under six. Further, an elderly handicapped person is not necessarily more able to protect themselves than a child under the age of six years. Appellant does not assert that the Texas Constitution provides greater protection than the United States Constitution, so we will treat those claims as one.

This issue was addressed in *Henderson v. State*, 962 S.W.2d 544 (Tex.Crim.App. 1997), *cert. denied,* 525 U.S. 978, 119 S.Ct. 437, 142 L.Ed.2d 357 (1998),[6] in which the Court of Criminal Appeals found that the State has a legitimate and compelling interest in protecting the well-being of its children and, in doing so, may designate a sub-class of young children. *Id.* at 562. The court then turned to the question of whether section 19.03(a)(8) is rationally related to serve that interest. In doing so, the court noted that for a child-murderer provision to have clarity, a numerical line must be drawn somewhere. *Id*. Further, children under the age of six are usually still living at home, are thus particularly vulnerable to caregivers and, even though the line could have been drawn at a different age, that fact does not invalidate the statute. *Id.* We therefore overrule appellant's seventh issue.

In his eighth and final issue, appellant asserts that the trial court erred in declaring Irene to be a defense witness when she was recalled by him during his case-in-chief. After Irene testified for the State, appellant reserved his questions for the witness. When the State rested and appellant commenced presentation of his case, he called Irene as a witness. During his examination of Irene, the State objected to appellant leading the

---

[6]*See also Ripkowski v. State*, 61 S.W.3d 378, 392 (Tex.Crim.App. 2001).

11

witness. Appellant responded that it was cross-examination, and he was therefore authorized to do so. However, the court sustained the objection because appellant had called the witness. Later, the State again objected to a question as leading, which the court sustained without further objection from appellant. At the end of Irene's testimony during the guilt-innocence phase, appellant voiced his objection "with respect to the declaration by the Court that Irene Ramos had become a witness for the Defendant, thereby allowing the State to cross-examine and lead the witness." The court responded as follows:

> Well, if you wanted to cross examine the witness, and you wanted to reserve your cross examination questions, then you should have recalled that witness before the State rested its case. Once the State rested its case, then your reservation of cross examination then ended. If you want to call her in your case-in-chief, that makes her your witness.

Generally, leading questions should not be used on direct examination, except as necessary to develop the testimony, although there is a right to lead a witness on cross-examination. Tex. R. Evid. 611(c). However, appellant must show an abuse of discretion by the trial court in permitting the use of leading questions on the part of the State in what he impliedly argues was redirect examination by showing he was unduly prejudiced by the questions. *Wyatt v. State,* 23 S.W.3d 18, 28 (Tex.Crim.App. 2000). Harm must also be demonstrated with respect to the trial court's failure to permit appellant to lead on cross-examination. *See Craig v. State,* 594 S.W.2d 91, 96 (Tex.Crim.App. 1980).

12

No bill of exception was made during trial. Appellant argues in his brief that he was harmed because he was deprived of "leading the witness to testify concerning certain matters elicited from her when counsel for Appellant and his investigator traveled some 200 miles to interview her." Nevertheless, he does not specify what this information was, other than to state that he sought to explore her feelings that the death penalty should not be sought. Since appellant was not sentenced to death, he was not harmed by the lack of this testimony. Appellant asserts that other specific examples "may be ascertained by re-reading her testimony at trial of the objections of the District Attorney." It is appellant's responsibility to apprise this court of the harm incurred by informing us of the specific testimony he sought to elicit but was deprived of, citing to those instances in the record, and providing an explanation as to why the error was prejudicial or harmful. *See Alvarado v. State*, 912 S.W.2d 199, 210 (Tex.Crim.App. 1995). This court is not required to search the record and make speculative assumptions as to any harm appellant may be claiming. Thus, assuming arguendo, that the trial court erred and that such error was properly preserved at trial, appellant has failed to demonstrate any harm. We therefore overrule his eighth issue.

Having overruled all of appellant's issues, we affirm the judgment of the trial court.

John T. Boyd
Senior Justice

Do not publish.

13