

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

---

No. 06-14-00114-CR

---

RANDYAEL DONTRELL TYSON, Appellant

V.

THE STATE OF TEXAS, Appellee

---

On Appeal from the County Court
Lamar County, Texas
Trial Court No. 61504

---

Before Morriss, C.J., Moseley and Burgess, JJ.
Memorandum Opinion by Justice Burgess

# MEMORANDUM OPINION

Following Randyael Dontrell Tyson's conviction by a Lamar County jury of theft, he was sentenced to serve 100 days in jail, fined $432.00, ordered to pay restitution of $88.00, and assessed court costs of $302.00. Tyson appeals to this Court claiming that (1) there is insufficient evidence to support his conviction, (2) there is insufficient evidence to support the assessment of court costs against him, (3) the trial court abused its discretion in limiting his argument to the jury, and (4) the trial court's limitation of his argument to the jury also denied him his right to adequate representation by counsel. Since we find that there is sufficient evidence to support the conviction and the assessment of costs and that Tyson failed to preserve his related complaints regarding the limitation of his jury argument and the denial of adequate representation, we affirm the trial court's judgment.

## I. Factual Background

This case arose out of a trip to a Walmart store made by Tyson and his wife, Kimber, the evening of December 6, 2013. The State called two witnesses. The first was Dustin Calhoun, an asset protection officer for Walmart. Calhoun testified that he had seen Tyson and another male in the store earlier that day. A few hours later, he observed Tyson and a female (later identified as Kimber) selecting merchandise at a high rate of speed, which, he explained, "gives notice that they're not probably going to pay for it . . . [t]hey're not paying attention to what they're selecting, the amounts they're selecting." Calhoun began to follow them and watched them select cosmetics, perfume, deodorant, and razors. After selecting the items, they went to the store's purse department where Tyson ripped open the razor package and placed the razor, along

2

with other merchandise into his pocket. They then went around the jewelry department, bypassed the registers, and without paying for the items, exited toward the parking lot upon reaching the last door and began running toward their car. When they got to their car, a red Mustang, they turned and saw Calhoun following them, abandoned their car, and ran to a nearby trailer park. Calhoun telephoned the police and continued following them, but he did not chase them.

Although Calhoun saw them take multiple quantities of several items, he prepared a receipt reflecting only one of each item taken, resulting in a total retail value of $87.91. He testified that although he was some distance away, he was familiar with the various brands and could distinguish them because he looks at the merchandise every day. He also prepared a surveillance video compilation consisting of eleven excerpts from various security cameras in and around the store. The video recording showed Tyson and another male, later identified as his friend, Courtney, exiting their car, and it showed Tyson and Kimber selecting merchandise, exiting the store, and running through the parking lot. Although there is footage that shows Tyson and Kimber entering the purse section with merchandise in their shopping cart, there is no footage of them in the purse section. Calhoun explained that no security cameras monitor the purses because it is neither a high loss area nor an area containing liquid, "where slips and falls can happen." He also testified that he did not find any merchandise in the parking lot and only found two empty packages in the shopping cart.

Jeremy Duerksen, an officer with the Paris Police Department, also testified on behalf of the State. Duerkson testified that he was able to identify Tyson and Kimber by the still frames

from the video recording supplied by Calhoun. Duerksen also ran the license plate number of the vehicle left in the parking lot to identify the name and address of the registered owner. About two or three hours after the incident, when the vehicle was no longer in the Walmart parking lot, Duerksen went to the registered owner's address. When he arrived, the red Mustang he had seen at Walmart was parked at the residence. Through a window next to the door, he could see Tyson laying on a couch and Kimber sitting on the couch. He knocked on the door, and Kimber came to the window and looked out at him. After he identified himself as a police officer, Kimber woke up Tyson, and both of them ran to the back of the house. Tyson was wearing the same clothes that Duerksen had observed him wearing in the still shots from the security camera video recording.

According to Duerksen, Tyson's mother, Vickie, and father answered the door. His father gave Duerksen a gesture to come in and went to look for Tyson and Kimber. He told Duerksen that he found them in the back of the residence and that Kimber was located in the shower, fully clothed. Duerksen remained in the living area, but could see down the hallway and into the kitchen. He did not see any of the merchandise taken from Walmart in the house. He asked Vickie if he could look for the merchandise elsewhere on the premises and she refused. Duerksen also told them that there was surveillance video footage showing Tyson and Kimber stealing the items, but when Tyson and Kimber asked to see it, he told them they could not.

At trial, only Kimber testifed in Tyson's defense. Kimber testified that she, Tyson, and Courtney had driven to Walmart that evening in Vickie's car. Initially, Kimber remained in the car while Tyson and Courtney entered the store. A security camera video recording shows that

4

Tyson and Courtney exited from a red Mustang around 8:43 p.m. and walked toward the store entrance. Around ten or fifteen minutes later, Tyson returned to the car to check on Kimber. At that point, according to Kimber, she decided to go into the store to purchase some hair products. After grabbing a shopping cart, she and Tyson went to the cosmetics department.[1] Kimber stated that a short time later, she noticed a man, who she now knows to be Calhoun, walk by and look at them like they had "poop" on their faces. They continued to look at products and moved to the next aisle, where, according to Kimber's testimony, she saw Calhoun at the endcap, again looking at them like they had something on their faces.

Kimber indicated that she saw him again about five feet away when they were in the toy department. She testified that Calhoun was looking at them out of the corner of his eye, that she told Tyson, and that he said not to worry about it. As Kimber recalled things, Calhoun kept looking at them furtively, so she stared at him until he turned red and walked away. They then went to the purses section to look for a wallet. Kimber recalled that as she bent over to look at one, she saw Calhoun once again, and she began getting mad because she realized there was something not right with the man. She testified that she was going to confront him, but her husband persuaded her against it. According to Kimber, they then left the shopping cart on the purse aisle and exited the store. As they were leaving the store, she looked at Tyson and saw Calhoun in her peripheral vision, coming rapidly at them. Her anger turned to fear since he now seemed to be chasing them, so they began running. They ran back to their car, but the doors were locked, so they ran to the side of Walmart. She explained that they kept running because

---

[1]The first surveillance video footage showing Tyson and Kimber in the cosmetics department reflects a beginning time of 9:06:28 p.m.

5

Calhoun had chased them and then they did not know where he went. They ran to a pizza restaurant where they called Courtney, who had the car keys, and asked him to take them home. Later that night, the police came to the house.

Kimber testified that when the police arrived, she was in the hall bathroom, Tyson was asleep on the couch, and Vickie and her husband, Rodney, were in their bedroom. She heard the knock and went to the door. She saw two policemen, but did not open the door because she was not fully dressed. She woke Tyson to let him know the police had arrived because he was not fully dressed either. Then she asked Vickie if she had called the police and went to Vickie's bathroom to put on some clothes. Tyson followed Kimber to the bathroom to dress. Kimber was still in the bathroom when a policeman came to get her. The officer told her to come out, and they went to the living room. The officers explained why they were there and described the security camera video recording from Walmart. Kimber and Tyson asked to see the video.

At Tyson's trial, Kimber revealed that she had been charged with the same offense and that she had been offered a plea bargain if she testified against her husband. On cross-examination, she admitted that she did not tell a Walmart employee or manager about the stranger looking at her. She explained that she preferred to leave and not get other people involved. She also failed to tell the officers about the man when they came to her house because they were accusing her of stealing.

## II.	Sufficiency of the Evidence

### A.	Standard of Review

In his first point of error, Tyson contends that the evidence is legally insufficient to support the guilty verdict.  Specifically, Tyson contends that insufficient evidence to support the jury's verdict was presented at trial because the evidence that he "actually stole items" relies primarily on the disputed testimony of Calhoun.  He argues that the failure to recover any stolen merchandise, the lack of video evidence showing Tyson concealing any merchandise, and the plausible explanation given by Kimber all support his innocence.

In reviewing the legal sufficiency of the evidence, we consider all the evidence in the light most favorable to the jury's verdict to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt.  *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd.) (citing *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007)).  We examine legal sufficiency in light of the *Brooks* opinion, while giving deference to the responsibility of the trier of fact "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."  *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19).  We evaluate all of the evidence in the record, whether properly or improperly admitted, direct or circumstantial, and determine whether the evidence supports the verdict when viewed in the light most favorable to that verdict.  *Hartsfield*, 305 S.W.3d at 863 (citing *Clayton*, 235 S.W.3d at 778).

Legal sufficiency of the evidence is measured by the elements of the offense as defined by a "hypothetically correct jury charge." *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically correct jury charge "sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id*.

Tyson was convicted of theft of property having a value of more than $50.00 but less than $500.00. A person commits the offense of theft if "he unlawfully appropriates property with the intent to deprive the owner of the property." TEX. PENAL CODE ANN. § 31.03 (West Supp. 2014). A person appropriates property by acquiring or otherwise exercising control over property. TEX. PENAL CODE ANN. § 31.01(4)(B) (West Supp. 2014). Tyson only challenges the sufficiency of evidence that he unlawfully acquired or otherwise exercised control over the items.[2]

B.      Analysis of Evidence

Initially, we note that the jury was presented with two conflicting theories—the State's and Tyson's. The jury was uniquely able to assess both the credibility and demeanor of the witnesses who testified. Most importantly, the jury was able to assess Kimber's credibility and demeanor when she explained the events at Walmart, her and Tyson's flight from Walmart, and their actions at Vickie's house after the police arrived. From the guilty verdict, it is clear that the jury, which may believe or disbelieve any witness, rejected Kimber's explanation. Even if her

---

[2]Because Tyson denies that a theft even occurred, he does not reach the issue of intent.

8

explanation of all these events was "plausible," as Tyson argues, the jury may still have disbelieved it. Keeping these principles in mind, we consider the evidence in the light most favorable to the verdict.

As discussed above, Calhoun testified that he saw Tyson and his wife select items and put them in their shopping cart. He described how he moved from one position to another to see them without being seen. He also described how they ripped open a few packages and put the contents, along with other items, in their coats, abandoned the shopping cart, and exited the store without paying for the items they had taken. Calhoun then described how they suddenly began running as they reached the outside door, and how they continued running until they disappeared from the Walmart property. Tyson asserts that the video-recorded evidence does not show either of them "rapidly" selecting items, as Calhoun testified, nor does it show them ripping up packages and concealing items in their pockets. Nevertheless, a conviction may be supported solely on the testimony of a single eyewitness. *Lewis v. State*, 126 S.W.3d 572, 575 (Tex. App.—Texarkana 2004, pet. ref'd) (citing *Aguilar v. State*, 468 S.W.2d 75, 77 (Tex. Crim. App. 1971)). Although some of the video-recorded evidence may arguably contradict portions of Calhoun's testimony, other portions of the recording support his testimony. Further, the absence of video-recorded evidence of the act of concealment goes to the weight and credibility of Calhoun's testimony. The jury, as the exclusive judge of witness credibility and the weight to be given their testimony, was free to believe both Calhoun's explanation regarding the absence of this video evidence and that he was in the best position to witness the theft. *See Barnett v. State*,

9

344 S.W.3d 6, 13 (Tex. App.—Texarkana 2011, pet. ref'd) (citing *Wyatt v. State*, 23 S.W.3d 18, 30 (Tex. Crim. App. 2000)).

In addition, there is circumstantial evidence from which the jury could also infer guilt. The testimony of both Calhoun and Kimber, as well as the video-recorded evidence, together, establish that Tyson and Kimber began running as soon as they realized Calhoun was following them and that they kept running until they were no longer on the Walmart parking lot. It has long been recognized that a jury may infer guilt from the circumstance of flight. *Clayton v. State*, 235 S.W.3d 772, 780 (Tex. Crim. App. 2007) (citing *Hardesty v. State*, 656 S.W.2d 73, 78 (Tex. Crim. App. 1983)). Although Kimber offered an innocent explanation for their flight, she was unable to adequately explain why she did not simply notify a Walmart employee that they were being followed by Calhoun. Further, Officer Duerksen's testimony that Kimber and Tyson fled to the back of Vickie's house once he identified himself and that they were found hiding in the back bathroom is an additional circumstance from which the jury could reasonably infer guilt. Finally, when talking with the police at Vickie's house, neither Tyson nor Kimber offered an explanation for their flight from Walmart. We find that a rational jury considering this evidence could find beyond a reasonable doubt that Tyson unlawfully acquired or otherwise exercised control over Walmart's property. Therefore, we find there was sufficient evidence to support Tyson's conviction for theft. Tyson's first point of error is overruled.

### III.    Costs Assessment

Tyson also complains that there is insufficient evidence to support the trial court's assessment of $302.00 in court costs.  Tyson argues that since the record does not contain a certified bill of costs, a judgment against him for costs cannot be supported.

An appellant in a criminal case may challenge the sufficiency of the evidence supporting court costs on direct appeal.  *Armstrong v. State*, 340 S.W.3d 759, 766–67 (Tex. Crim. App. 2011).  To measure the sufficiency of the evidence supporting an assessment of court costs, we review the record in the light most favorable to the award.  *Whatley v. State*, No. 06-12-00117-CR, 2014 WL 7399130, at *1 (Tex. App.—Texarkana Dec. 30, 2014, no pet.) (mem. op., not designated for publication) (citing *Mayer v. State*, 309 S.W.3d 552, 557 (Tex. Crim. App. 2010)).  If a criminal action is appealed, the Texas Code of Criminal Procedure requires that "an officer of the court shall certify and sign a bill of costs stating the costs that have accrued and send the bill of costs to the court to which the action or proceeding is transferred or appealed."  TEX. CODE CRIM. PROC. ANN. art. 103.006 (West 2006).  Further, "[a] cost is not payable by the person charged with the cost until a written bill is produced or is ready to be produced, containing the items of cost, signed by the officer who charged the cost or the officer who is entitled to receive payment for the cost."  TEX. CODE CRIM. ANN. art. 103.001 (West 2006); *Ballinger v. State*, 405 S.W.3d 346, 348 (Tex. App.—Tyler 2013, no pet.).  In addition, there is no requirement that a certified bill of costs be filed, either at the time the judgment is signed or before the case is appealed.  *Whatley*, 2014 WL 7399130, at *1 (citing *Ballinger*, 405 S.W.3d at 348).  When a cost assessment is challenged on appeal, and the bill of costs has been omitted

11

from the appellate record, then the clerk's record may be supplemented with the bill of costs. *See* TEX. R. APP. P. 34.5(c)(1); *Whatley*, 2014 WL 7399130, at *1; *Ballinger*, 405 S.W.3d at 348.[3] In this situation, "supplementing the record to include the bill of costs is appropriate and does not violate due process." *Ballinger*, 405 S.W.3d at 349.

Since the clerk's record in this case did not originally include a bill of costs, we asked the Lamar County Clerk to prepare and file an itemized bill of costs. *See Whatley*, 2014 WL 7399130, at *2. In response, we received a supplemental clerk's record containing a certified bill of costs. The itemized bill of costs shows that, excluding the fine that was also included as court costs, the total amount of court costs was $302.00. Because the supplemental record contains a bill of costs supporting the amount of court costs assessed, we find that there is sufficient evidence to support the trial court's judgment for costs. We overrule this point of error.

## IV. Jury Argument

In his next two points of error, Tyson complains that the trial court abused its discretion in limiting his time for closing argument and, in so doing, denied his Sixth Amendment[4] right to full representation of counsel.[5] Since we find Tyson failed to preserve any error[6] related to the trial court's limitation of his jury argument, we overrule this point of error.

---

[3]*See also Johnson v. State*, 423 S.W.3d 385, 392 (Tex. Crim. App. 2014) ("We conclude that a bill of costs is a relevant item that if omitted from the record, can be prepared and added to the record via a supplemental clerk's record.").

[4]*See* U.S. CONST. amend. VI.

[5]Tyson does not argue that his trial counsel was ineffective; rather, he merely contends that he was denied the full scope of his Sixth Amendment right to counsel by the trial court's limitation on his counsel's closing argument.

After the charge conference, the trial court asked the State and Tyson how much time they needed to argue their case. The State responded, "Ten minutes, max," and Tyson's counsel responded, "15, 20 maybe." The court then informed counsel that it would give both sides fifteen minutes, without objection from Tyson. Near the end of his closing argument, the trial court advised Tyson's counsel that he had one minute, again without objection or comment from Tyson. A few moments later, the following exchange took place:

> THE COURT: Mr. Haslam, your time is up.
>
> [Tyson's Counsel]: May I have just another second or two?
>
> THE COURT: Hurry up.

Tyson's counsel then continued with his argument, until the trial court interrupted with the following:

> THE COURT: Okay. That's enough. Mr. Haslam, you're -- have a seat, sir. Your time is up.
>
> [Tyson's Counsel]: Of course it is, Your Honor. Ladies and gentlemen, I ask you to find my client not guilty. There is no evidence.

The State then concluded its rebuttal, and the jury was dismissed to deliberate. Only then did Tyson object to the limitation on his closing argument, claiming it was "premature" and advising the trial court of other areas he wished to cover in his closing argument. In response, the trial court noted that it had given him an additional one and one-half minutes.

---

[6]Although the State has not raised this issue, "a court of appeals should review preservation of error on its own motion." *Ford v. State*, 305 S.W.3d 530, 532–33 (Tex. Crim. App. 2009) (citing *Jones v. State*, 942 S.W.2d 1, 2 n.1 (Tex. Crim. App. 1997)).

In order to preserve a complaint for appellate review, the record must show that:

> (1) the complaint was made to the trial court by a timely request, objection, or motion that:
>
> > (A) stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context . . . .

TEX. R. APP. P. 33.1(a)(1)(A); *Pena v. State*, 285 S.W.3d 459, 463 (Tex. Crim. App. 2009). The complaining party must "let the trial judge know what he wants, why he thinks himself entitled to it, and to do so clearly enough for the judge to understand him at a time when the judge is in a proper position to do something about it." *Lankston v. State*, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992). Only when the complaint is timely made does the trial court have the opportunity to correct any error. *See Pena*, 285 S.W.3d at 464.

Here, Tyson did not raise a timely objection. Before argument began, Tyson advised the trial court that he needed fifteen, maybe twenty minutes for closing, but then acquiesced when the trial court gave him only fifteen minutes. When initially advised that his time was up, he only requested "another second or two" and was given an additional one and one-half minutes. Then, when he was finally advised that his time had expired, he again acquiesced rather than objecting or requesting more time. By failing to object to the limitation at a time when the trial court had the opportunity to correct any error, Tyson failed to preserve any error related to the

14

time limitation on his jury argument.[7]  *See*, *Appelt v. State*, Nos. 02-12-00431-CR, 02-12-00432-CR, 2013 WL 5675137, at *4 (Tex. App.—Fort Worth Oct. 17, 2013, pets. ref'd) (mem. op., not designated for publication); *Slatter v. State*, No. 13-11-00338-CR, 2012 WL 1072804, at *5–6 (Tex. App.—Corpus Christi March 29, 2012, no pet.) (mem. op., not designated for publication); *Johnson v. State*, No. 01-08-00709-CR, 2011 WL 6014218, at *6–7 (Tex. App.—Houston [1st Dist.] Dec. 1, 2011, no pet.) (mem. op., not designated for publication).[8]  We overrule these points of error.

We affirm the judgment of the trial court.


Ralph K. Burgess
Justice


Date Submitted:     March 3, 2015
Date Decided:     March 18, 2015

Do Not Publish

---

[7]This includes Tyson's claim implicating the Sixth Amendment. "Except for complaints involving systemic (or absolute) requirements, or rights that are waivable only, which are not involved here, all other complaints, whether constitutional, statutory, or otherwise, are forfeited by failure to comply with Rule 33.1(a)." *Mendez v. State*, 138 S.W.3d 334, 342 (Tex. Crim. App. 2004). Claims of ineffective assistance of counsel that violate the Sixth Amendment based on the *deficient performance of counsel* may be raised for the first time on appeal. *See, e.g.*, *Robertson v. State*, 187 S.W.3d 475 (Tex. Crim. App. 2006). The claim here, however, is that an error on the part of the trial court denied Tyson the "exercise of his full rights under" the Sixth Amendment. Sixth Amendment complaints based on trial court error must comply with Rule 33.1(a) or be forfeited. *See, e.g.*, *Ripkowski v. State*, 61 S.W.3d 378, 386 (Tex. Crim. App. 2001); *Ferree v. State*, 416 S.W.3d 2, 7 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd); *Deener v. State* 214 S.W.3d 522, 527 (Tex. App.—Dallas 2006, pet. ref'd).

[8]Although these unpublished cases have no precedential value, we may take guidance from them "as an aid in developing reasoning that may be employed." *Carrillo v. State*, 98 S.W.3d 789, 794 (Tex. App.—Amarillo 2003, pet. ref'd).