

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | § | |
|---|---|---|
| ZACHARY LEE MCCLELLAN, | | No. 08-19-00033-CR |
| | § | |
| Appellant, | | Appeal from the |
| | § | |
| v. | | 213th District Court |
| | § | |
| THE STATE OF TEXAS, | | of Tarrant County, Texas |
| | § | |
| Appellee. | | (TC# 1458845D) |
| | § | |

**O P I N I O N**

Appellant Zachary Lee McClellan was charged with intentionally and knowingly committing aggravated assault with a deadly weapon, and in so doing, causing serious bodily injury to a family member. Appellant's father, Grant McClellan, is the complaining witness of the charge.[1] A jury convicted Appellant of this charge then assessed his punishment at 35-years' confinement, which the trial court then imposed. In a single issue, Appellant argues the trial court abused its discretion in admitting his video-recorded confession during the trial. Appellant asserts he did not have the mental capacity to understand his rights at the time of the recording; and thus,

---

[1] To distinguish between father and son throughout this opinion, we will refer to Grant McClellan as "Grant," and Zachary McClellan as "Appellant."

he did not knowingly and intelligently waive his rights under *Miranda v. Arizona* and article 38.22 of the Texas Code of Criminal Procedure. Finding no error, we affirm.[2]

## I. BACKGROUND

Appellant, who was then 23 years old, lived with his father, Grant McClellan, and his father's wife, Robie, at his father's home in Watauga. Appellant graduated high school and attended some college courses, but he did not earn a degree. His father described Appellant as a quiet loner, mostly keeping to himself. Although Appellant was described as very knowledgeable with automotive mechanics, he worked at a fast-food restaurant in the months preceding the attack.

On the morning of June 6, 2016, Appellant began exhibiting some odd behavior: he told his father he feared something outside; at another point, he was quiet and appeared to be preoccupied in his mind; also, he was screaming while his father spoke on the phone with Robie. His behavior was worrisome enough for Robie to plead with the elder McClellan to call the police or a hospital for Appellant. And during a conversation, Appellant told his father he was on heroin. Nonetheless, Appellant and his father remained at home together, and Appellant stayed in his room, as was his usual custom.

Later that morning, Appellant appeared frightened as he came out from his room. After his father suggested that he read his Bible, Appellant returned to his room. After lunchtime, Grant heard Appellant reading louder and louder for about an hour, as if he were trying to speak over someone. Shortly afterward, Appellant came out of his room again and came into the living room where Grant sat on the couch. Appellant walked directly to a drawer where a straight razor used for shaving was stored. The razor was a family heirloom handed down from Appellant's great

---

[2] This case was transferred to us from the Second Court of Appeals pursuant to the Supreme Court of Texas's docket equalization efforts. As a transferee court, we follow the precedents from the transferor court where such precedent conflicts with our own. TEX. R. APP. P. 41.3.

2

grandfather. Appellant grabbed the razor and waived it at Grant. As Grant jumped up from the couch, Appellant approached while swinging it in his hand. To Grant, Appellant appeared ready to strike and use it.

Instead, Appellant hit Grant hard, on the left side of his face, using his fist. Although he remained standing, Grant described that Appellant's hit had "kind of knocked [him] stupid." Next, they started wrestling on the floor in front of the sofa. As Appellant pinned him down by climbing on top of his back, Grant could feel he was getting cut in the back of his neck. Positioned on his back, Appellant held him face-down in a narrow area in front of the sofa. Grant could feel that Appellant was cutting the back of his neck as he kept twisting to guard the front of his neck. During the attack, Appellant sliced a hole in the back of Grant's neck down to the bone, nearly sliced his left ear off, and—with his bare hands and using his thumbs—he gouged out his father's two eyeballs. Grant described the feeling before everything went dark: "Like all the muscles and tendons and everything had just been torn loose."

Eventually, Appellant dragged his father through the house and into the garage. Grant worried about what Appellant planned to do next. Remembering that Appellant had always been fond of the old Camaro that he was never allowed to drive, Grant suggested: "Why don't you take it and try to get away." As Grant lay in the garage feeling as if he came in and out of consciousness, he next described that he heard Appellant "hot-rodding" the Camaro around the block. By sheer fortune, Robie and a neighbor later found Grant lying in the garage, and paramedics flew him by helicopter to a hospital.

As Appellant drove down the street in his father's Camaro, he lost control, spun out, and crashed into a neighbor's home. When one of the home's visitors entered from the backyard, he found Appellant inside the house reaching into a fish tank. Appellant told him he needed water

3

then proceeded to exit and jump the backyard fence. Responding officers soon found him standing in a front yard, soaking wet, with a blank look on his face.

Not knowing the entirety of the situation at this time and believing that only a driving-while-intoxicated offense had occurred, Officer Marshall McGee began to administer DWI field-sobriety tests on Appellant but stopped once Appellant clenched his fists and jaw, bared his teeth, and growled. At that point, Officer McGee arrested Appellant for criminal trespass and reckless driving. Officer McGee read Appellant his *Miranda* warnings, and when asked if he wanted to speak, Appellant responded, "No." Officer McGee then placed him in the back of a patrol car. While in the backseat, a paramedic assessed Appellant, and Appellant told the paramedic that he had snorted "angel dust," also known as "PCP." Although the paramedic observed that Appellant was generally exhibiting bizarre behavior, Appellant's vitals were normal aside from an elevated heart rate, and the paramedic medically cleared him.

During Appellant's transport to the jail, he began speaking to himself. When Appellant started crying, Officer McGee asked, "What's the matter?" Appellant responded, "My f***ing dad's dead." As Appellant digressed into talking about how his father "wouldn't stop juicing," Officer McGee continued driving but he soon heard a medical call over the radio. Only at that point did Officer McGee realize that "something a little bigger" had occurred. Once at the jail, a detention officer asked Appellant if he had any family or friends, and Appellant responded that he had just killed his father.

The next day on June 7, 2016, at a little after 4:00 p.m., Detective Nance and Sergeant Babcock interviewed Appellant at the jail. Detective Nance informed Appellant of his rights under *Miranda* and article 38.22, and when Detective Nance asked him if he understood his rights, Appellant answered affirmatively. When asked if he wanted to talk to the officers, Appellant again

4

answered affirmatively. Still, Sergeant Babcock informed Appellant once more that the decision to discuss the attack was completely up to Appellant and that Appellant could stop their discussion at any time.

After again confirming he was comfortable conversing with the interviewers, Appellant began describing the events leading up to the attack and the attack itself. Appellant stated that, over the weekend leading up to the offense, he had spent time with friends. At one point, he and his friends watched a horror movie. Although Appellant hesitated to answer when he was asked whether they had smoked marijuana, he ultimately admitted they had done so once Sergeant Babcock and Detective Nance confirmed that his response would not get anyone into trouble. Appellant then admitted his friends gave him marijuana to smoke, and though he was unsure if it was laced with anything, he began to feel odd sensations afterward. Appellant explained during his interview that he had experienced outlandish thoughts and sensations before and after the offense occurred. While talking to detectives he recalled events from memory in a cogent, chronological manner. At times sobbing during his telling, he narrated his attack on his father. Appellant also asked if his father was okay, and when Detective Nance asked Appellant if the two got along, Appellant responded, "Yeah. He's my friend." Toward the end of the interview, the officers explained to Appellant how the legal process would work for his case including the possibility of prosecution. Appellant indicated he had no questions.

Five days after the interview, on June 12, 2016, Appellant's blood was collected pursuant to a search warrant and subsequently tested. According to a testifying forensic toxicologist who interpreted that test, Appellant's blood tested positive only for the presence of marijuana. His blood was also screened for several other categories of drugs, and while none were detected, the toxicologist testified that the substances would remain in the blood for only about one day from

the time of use.

At trial, many witnesses testified including Appellant's father, Appellant's friends, Appellant's neighbors, experts from the field of psychology, and several responding officers. Supplementing his testimony about the attack itself and his recovery, Appellant's father testified that Appellant's mother and grandmother had a history of mental illness but Appellant himself had never been diagnosed with any such condition. J. Randall Price, Ph.D., testified for the State and concluded Appellant suffered from a psychotic episode on the day of the attack called cannabis-induced psychosis with an underlying schizotypal personality disorder: "A cannabis-abuse disorder and an alcohol-use disorder." He attributed the attack to the drugs and alcohol Appellant consumed. Emily Fallis, Ph.D., testified for the defense and stated she believed Appellant suffered a more severe mental disorder, called schizoaffective disorder, which caused his attack. Dr. Fallis also created a report—the findings of which she based on her interview with Appellant and other witnesses, as well as her review of other sources of pertinent information—and concluded that "[a]t the time of the alleged offense, [Appellant], as a result of a severe mental disease or defect, did not know his conduct was wrong. He was experiencing auditory hallucinations and delusions which left him confused, frightened, and susceptible to the influence of his bizarre thoughts." The two experts' diagnoses conflicted regarding the severity and scope of Appellant's mental state on the day of the attack and thereafter.

Although Appellant invoked his right to remain silent and declined to testify at trial, the State offered Appellant's video-recorded interview into evidence as an exhibit. After the State offered the video, Appellant initially declared that he had "[n]o objection." The trial court admitted the exhibit, but before the State published it to the jury, the court immediately took a brief recess. After the recess and still before publication, Appellant orally objected to the exhibit for the first

6

time based on a motion to suppress that he filed prior to trial, contending that he did not "knowingly, freely, and voluntarily" waive his rights. As the basis for his motion, Appellant referenced Dr. Fallis' report—the conclusions of which are described above.

The trial court reviewed Appellant's motion along with Dr. Fallis' report and denied the motion to suppress. Nonetheless, immediately after the court's ruling, the State offered to briefly present additional testimony from Detective Nance. Outside the presence of the jury, Detective Nance briefly testified that he administered *Miranda* warnings to Appellant, and afterwards, he believed Appellant had "freely and voluntarily" agreed to talk to him. Following this additional testimony from Detective Nance, the trial court again denied Appellant's motion. The State then published Appellant's video-recorded interview to the jury.

During the next recess and outside the jury's presence, the trial court elaborated on its prior ruling on Appellant's motion to suppress and entered oral findings of fact:

> . . . I've now had a chance to watch the entire hour-long video of the Defendant's statements.
>
> I'm even more convinced now than I was earlier that the statements are appropriately before the jury, that the statements were freely and voluntarily made. From my view of the video, it appears that the Defendant at the time was responsive to the questions asked of him. Even though it's a long, somewhat meandering interview, there are times when the Defendant seems to be appropriately emotional, especially when he was describing the struggle with his dad or times in the video where he cried.
>
> It's clear from the video that he was treated gently by the officers. It's also clear from the video he had a good recall. He was very descriptive of the events leading up to this day and actually the events of this offense.
>
> There was also a portion at the end where the officer's explaining the legal procedures that will take place following this interview. They're describing to him the legal process. They're describing to him the bond process. It's clear from the video the Defendant understands that. He's tracking this conversation appropriately.
>
> Frankly, I can understand now, after watching the video, why -- why the Defense, I believe, you know, if they didn't explicitly do it, I guess implicitly did it when they decided to withdraw their motion by not objecting to the introduction of this evidence.

The jury is now able to see a young man with emotion. The jury's able to see a young man giving his version of events and why they happened without him having to testify. Anyway, I -- obviously, I just wanted to make that clear for the record. I think we were in a rush in coming back from the break, and I don't think I stated exactly what I should have stated on the record.

I also find, after hearing this officer's testimony, that -- I find his testimony to be quite credible. I want to make that clear on the record before we move on about their earlier Motion to Suppress. I should have done it earlier. My apologies.

After that denial, the trial proceeded and eventually concluded. The trial court's jury charge, to which neither party objected or requested alterations, instructed the members of the jury that Appellant was charged with the offense of aggravated assault with a deadly weapon causing serious bodily injury to a member of Appellant's family or household. The charge acknowledged the jury heard statements made by Appellant to law enforcement, which refers to the video-recorded confession. The charge permitted the jury to consider the statements made during that video-recorded confession if it determined Appellant made those statements freely and voluntarily. The charge also included Appellant's affirmative defense of insanity and instructed, among other things, "no act done in a state of insanity can be punished as an offense." The jury unanimously found Appellant guilty, rejecting a finding of not guilty by reason of insanity. Subsequently, Appellant moved for a new trial and filed this appeal.

## II. ISSUE ON APPEAL

In a single issue, Appellant argues that the trial court abused its discretion in admitting his video-recorded confession where he "did not have the mental capacity to understand his rights," because, "due to his serious mental disease or defect, he did not know right from wrong," and thus, he could not have made a valid waiver of his *Miranda* and article 38.22 rights. Appellant challenges only the trial court's determination that his waiver was made knowingly and intelligently, and in this appeal, Appellant does not dispute that he voluntarily made his waiver or

that he received adequate warnings under *Miranda* and article 38.22.

In response, the State argues: (1) Appellant failed to preserve his issue for appellate review; (2) the trial court did not abuse its discretion in finding that Appellant validly waived his rights where sufficient evidence established his waiver was made knowingly and intelligently; and (3) even if the trial court erred, any error was harmless.

## III. DISCUSSION

### A. Standard of Review

We review a trial court's ruling on a motion to suppress for an abuse of discretion. *State v. Cortez*, 543 S.W.3d 198, 203 (Tex. Crim. App. 2018). In doing so, we apply a bifurcated standard of review. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007). We defer almost totally to the trial court's rulings on questions of historical fact, as well as mixed questions of law and fact that turn on evaluating credibility and demeanor. *Id.* But we review other mixed questions of law and fact—those that do not turn on credibility or demeanor—de novo. *Id.*

In other words, we view the evidence in the light most favorable to the trial court's ruling. *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). When the trial court makes explicit fact findings, we determine whether the evidence, viewed in the light most favorable to the trial court's ruling, supports those findings. *Id.*; *see also State v. Cullen*, 195 S.W.3d 696, 699 (Tex. Crim. App. 2006) (recognizing that findings and conclusions may be "stated on the record at the hearing"). We then review the trial court's legal ruling de novo unless its explicit fact findings that are supported by the record are also dispositive of the legal ruling. *Kelly*, 204 S.W.3d at 818.

### B. Applicable Law

#### 1. The Protection Against Self-Incrimination under the Fifth Amendment and under Article 38.22 of the Texas Code of Criminal Procedure

9

The Fifth Amendment, which is applicable to the states, provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V; *see also Ramos v. State*, 245 S.W.3d 410, 418 (Tex. Crim. App. 2008). Under this right, statements obtained from an accused during custodial interrogation are inadmissible unless the government demonstrates that it observed certain procedural safeguards. *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966); *Pecina v. State*, 361 S.W.3d 68, 75 (Tex. Crim. App. 2012). Those safeguards include advising the accused of the warnings spelled out in *Miranda*. *See Miranda*, 384 U.S. at 444; *Pecina*, 361 S.W.3d at 75. And under *Miranda*, statements an accused makes during a custodial interrogation are inadmissible at trial unless the accused is advised of his rights and voluntarily, knowingly, and intelligently waives them. *Berghuis v. Thompkins*, 560 U.S. 370, 382-83 (2010); *Pecina*, 361 S.W.3d at 75.

In addition to being governed by *Miranda*, an accused's right against self-incrimination during a custodial interrogation is likewise protected under article 38.22 of the Texas Code of Criminal Procedure. TEX. CODE CRIM. PROC. ANN. art. 38.22; *see also Joseph v. State*, 309 S.W.3d 20, 23-24 (Tex. Crim. App. 2010). And like the Fifth Amendment protection, article 38.22 provides that oral statements a defendant makes during a custodial interrogation are inadmissible at trial unless the defendant is first given certain statutorily required warnings and thereafter voluntarily, knowingly, and intelligently waives those stated rights. TEX. CODE CRIM. PROC. ANN. art. 38.22 § 3(a)(2). Aside from requiring one additional warning, article 38.22 warnings are virtually identical to the *Miranda* warnings. TEX. CODE CRIM. PROC. ANN. art. 38.22 § 2(a)(1)-(5); *see also Herrera v. State*, 241 S.W.3d 520, 526 (Tex. Crim. App. 2007). These statutorily mandated warnings, including the additional fifth warning not required by *Miranda*, must inform the defendant of the following rights:

(1)     he has the right to remain silent and not make any statement at all and that any statement he makes may be used against him at his trial;

(2)     any statement he makes may be used as evidence against him in court;

(3)     he has the right to have a lawyer present to advise him prior to and during any questioning;

(4)     if he is unable to employ a lawyer, he has the right to have a lawyer appointed to advise him prior to and during any questioning; and

(5)     he has the right to terminate the interview at any time[.]

TEX. CODE CRIM. PROC. ANN. art. 38.22 § 2(a)(1)-(5).

## 2. The State's Burden to Prove a Valid Waiver of Rights

The State bears the burden to show by a preponderance of the evidence that a defendant validly waived his or her rights under *Miranda* and article 38.22. *See Joseph*, 309 S.W.3d at 24. We determine whether a waiver was valid by considering the totality of the circumstances. *Id.* at 25. For a challenge to the validity of a waiver of rights under article 38.22, a defendant's mental illness is simply one among many potential factors in the totality-of-the-circumstances analysis. *See Williams v. State*, 502 S.W.3d 262, 272 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd); *Lott v. State*, No. 02-18-00487-CR, 2019 WL 5792660, at *7 (Tex. App.—Fort Worth Nov. 7, 2019, pet. ref'd) (mem. op., not designated for publication).

> There are two facets to any inquiry with respect to the adequacy of a purported waiver:
>
> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986). Thus, to establish that a defendant's waiver was knowing and intelligent, the record need only reveal that he at all times knew he could remain

11

silent and was aware of the State's intention to use his statements to secure a conviction. *See Leza v. State*, 351 S.W.3d 344, 349 (Tex. Crim. App. 2011). And in making this determination, a trial court is entitled to make fact findings favoring validity of the waiver despite conflicting evidence, even where an expert witness testifies that the waiver was not valid. *See Leza*, 351 S.W.3d at 359 (overruling defendant's contention that his heroin use precluded his ability to make a knowing and intelligent waiver of his rights where, despite testimony from a defense expert in behavioral pharmacology that the defendant was obviously under the influence of heroin intoxication during the interrogation, the trial court was free to credit the testimony of the detaining and interrogating officers that the defendant was alert, appeared to comprehend the warnings and the questions propounded to him, was coherent and appropriate in his responses, and did not appear to be under the influence of heroin); *Ripkowski v. State*, 61 S.W.3d 378, 383-84 (Tex. Crim. App. 2001) (holding that the trial court was within its discretion in finding that the defendant understood his rights and the effect of waiving those rights, despite expert testimony that he was suffering from bipolar disorder and cocaine binging and was therefore incompetent to understand and waive his rights, where: (1) various law-enforcement officials testified that the defendant appeared to comprehend the warnings and questions asked during the interrogation, that he was coherent and gave appropriate answers to questions, and that he did not appear to be under the influence of any intoxicant; and (2) "[a]lthough [the defendant] presented expert testimony that conflicted with that of the State's witnesses, the trial court was entitled to believe the State's witnesses rather than [the defendant's] expert.").

### C. Application

#### 1. Whether this Court Can Consider the Testimony of Detective Nance

At the outset, Appellant argues that Detective Nance's testimony, specifically about the

validity of his waiver, is not available for our consideration in reviewing his appellate issue. He contends that this is because the trial court had already made its ruling on his suppression motion prior to Nance's additional testimony about the validity of his waiver and because the court's later explanation for its ruling did not constitute an explicit reopening of the hearing on the motion. On appellate review of a suppression motion, a reviewing court may only consider evidence available to the trial court when it ruled on a motion to suppress. *O'Hara v. State*, 27 S.W.3d 548, 551 (Tex. Crim. App. 2000). However, as the State points out, a trial court has discretionary authority to reopen a hearing on a motion to suppress evidence, even mid-trial, to allow for additional evidence and a reconsideration of its prior ruling. *See Black v. State*, 362 S.W.3d 626, 635-36 (Tex. Crim. App. 2012).

Here, the record shows that the trial court reopened its hearing on Appellant's motion, if but momentarily, and allowed for additional evidence. In the trial court's explanation on its ruling, entry of fact-findings, and reaffirmation of its denial of the motion, the trial court expressly referenced its consideration of Detective Nance's additional testimony when it made a favorable credibility finding on his testimony. Thus, we hold that Detective Nance's additional testimony is available for our consideration. *See id.*

### 2. Whether the Trial Court Abused its Discretion in Ruling that Appellant's Waiver was Knowing and Intelligent

For his contention that the State failed to prove his waiver of rights was knowing and intelligent, Appellant relies on two sources of evidence: (1) Dr. Fallis' report which he had attached to his motion to suppress; and (2) the various witness testimony "regarding [Appellant's] bizarre and peculiar behavior" that occurred before and after his offense. In her report, Dr. Fallis provided an expert opinion that Appellant "as a result of a severe mental disease or defect, did not know his

conduct was wrong." In addition, several witnesses described at trial how Appellant had engaged in extraordinary, bizarre behavior both before, during, and after the attack on his father. The morning began with Appellant exhibiting such unsettling behavior that Robie became worried, and after lunch, Appellant appeared frightened before he started to read his Bible louder and louder, as though he were trying to speak over someone. And while, by any measure, both Appellant and Grant cared for each other, Appellant engaged in the unprecedented, inexplicable attack on his father. Then, Appellant hot-rodded down the block in his father's Camaro, crashed into a neighbor's home, searched desperately for water, and was eventually arrested in a front yard, soaking wet, and displaying a blank look on his face. He later growled at Officer McGee while clenching his fists and baring his teeth, and he continued to exhibit bizarre behavior while being evaluated by a paramedic. Finally, while being transported to the jail, Appellant spoke to himself, cried over his father's condition, but also accused him of "juicing."

However, the State provided contrary evidence showing that Appellant's waiver of his rights was, in fact, knowing and intelligent. First, Appellant, in his own words, affirmatively stated in his video-recorded interview that he understood his rights. And in the trial court's oral findings regarding Appellant's interactions with Detective Nance as reflected in the video-recorded interview, the court observed that Appellant was responsive to the questions asked of him; that he was appropriately emotional; that he had good, descriptive recall of the events; and that he understood the ensuing legal process for his case as explained by the officers. Our review of the video-recorded interview supports these fact-findings, and they are accordingly afforded great deference. *See Amador*, 221 S.W.3d at 673; *Kelly* 204 S.W.3d at 818. Second, Appellant apparently understood his rights and chose to enforce them when he declined to speak to Officer McGee before he was transported to the jail. Third, while Detective Nance did not specifically

14

opine on whether Appellant's waiver was knowing and intelligent (instead, opining that Appellant's waiver was "freely and voluntarily" given), Detective Nance's observation, nonetheless, supports an inference that Appellant was not hindered by an unstable mind at the time of his interview, which was a day after the attack.

Ultimately, the trial court was provided with two sets of facts supporting conflicting findings on Appellant's ability to make a knowing and intelligent waiver of his *Miranda* and article 38.22 rights. Despite Dr. Fallis' expert opinion and the bizarre behavior described by witnesses, the trial court was entitled to favor the video-recorded interview and officer testimony to the contrary, and we hold that the trial court did not abuse its discretion in ruling that the State met its burden of proving Appellant's waiver of his rights was knowing and intelligent. *See Leza*, 351 S.W.3d at 351; *Ripkowski*, 61 S.W.3d at 383-84; *see also Foster v. State*, 579 S.W.3d 606, 614-15 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (holding that the record supported the trial court's finding that the defendant understood his rights and voluntarily agreed to waive them, despite his suffering from untreated schizophrenia, based on the following: "The video evidence does not reflect that appellant exhibited any obvious signs of mental illness *during the detective's interrogation*. Appellant spoke clearly and concisely. His answers were responsive and focused. The detective also testified that appellant appeared to be comfortable and that he never asked for medical attention." (emphasis added)); *accord Lott*, 2019 WL 5792660, at *5, *7-9 (rejecting the defendant's contention on appeal that he did not knowingly and intelligently waive his rights under article 38.22, even though he had been diagnosed with schizoaffective disorder a year before his confession, where: (1) before the defendant's interview, he affirmed that he comprehended the warnings spelled out to him; and (2) the interviewing detective testified that the defendant's statement appeared to be intelligent and knowing).

Consequently, we overrule Appellant's issue presented for review, and we need not consider the State's alternative arguments for upholding the trial court's ruling based on waiver and harmless error.

## IV. CONCLUSION

The trial court's judgment is affirmed.


GINA M. PALAFOX, Justice

January 14, 2021

Before Rodriguez, C.J., Palafox, and Alley, JJ.

(Do Not Publish)